1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DEBRA FRANKLIN AUSTIN

                                    Plaintiff,

v.

ANDREW M. SAUL, Commissioner of
Social Security,[1]

                                    Defendant.

Case No.: 19-CV-604-JM(WVG)

**REPORT AND
RECOMMENDATION ON CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

**[Doc. Nos. 12, 17.]**

This is an action for judicial review of a decision by the Commissioner of Social Security, Andrew M. Saul, denying Plaintiff Debra Franklin Austin supplemental security income ("SSI") benefits under Title XVI of the Social Security Act (the "Act") and Social Security Disability Insurance under Title II of the Act. The parties have filed cross-motions for summary judgment, and the matter is before the undersigned Magistrate Judge for preparation of a Report and Recommendation. For the reasons stated below, the Court RECOMMENDS that Plaintiff's motion for summary judgment be GRANTED-IN-PART

---

[1] Per Federal Rule of Civil Procedure 25(d), an "officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d). Andrew Saul has succeeded Nancy Berryhill as Commissioner of the Social Security Administration during the pendency of this case.

and DENIED-IN-PART, Defendant's cross-motion for summary judgment be GRANTED-IN-PART and DENIED-IN-PART, and the matter be remanded for further proceedings.

## I.   OVERVIEW OF SOCIAL SECURITY CLAIM PROCEEDINGS

Pursuant to the Social Security Act, the Social Security Administration ("SSA") administers the SSI program. 42 U.S.C. § 901. The Act authorizes the SSA to create a system by which it determines who is entitled to benefits and by which unsuccessful claimants may obtain review of adverse determinations. *Id.* §§ 423 *et seq.* Defendant, as Acting Commissioner of the SSA, is responsible for the Act's administration. *Id.* § 902(a)(4), (b)(4).

## A.   The SSA's Sequential Five-Step Process

The SSA employs a sequential five-step evaluation to determine whether a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520. To qualify for disability benefits under the Act, a claimant must show that (1) he or she suffers from a medically-determinable impairment[2] that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more and (2) the impairment renders the claimant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy. *See* 42 U.S.C. §§ 423(d)(1)(A), (2)(A); 1382(c)(3)(A).

A claimant must meet both requirements to qualify as "disabled" under the Act, *id.* § 423(d)(1)(A), (2)(A), and bears the burden of proving that he or she "either was permanently disabled or subject to a condition which became so severe as to create a disability prior to the date upon which [his or] her disability insured status expired," *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995). An administrative law judge

---

[2] A medically-determinable physical or mental impairment "is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

("ALJ") presides over the five-step process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003) (summarizing the five-step process). If the Commissioner finds that a claimant is disabled or not disabled at any step in this process, the review process is terminated at that step. *Corrao v. Shalala*, 20 F.3d 943, 946 (9th Cir. 1994).

Step one in the sequential evaluation considers a claimant's "work activity, if any." 20 C.F.R. § 404.1520(a)(4)(i). An ALJ will deny a claimant disability benefits if the claimant is engaged in "substantial gainful activity." *Id.* §§ 404.1520(b), 416.920(b).

If a claimant cannot provide proof of gainful work activity, the ALJ proceeds to step two to ascertain whether the claimant has a medically severe impairment or combination of impairments. The so-called "severity regulation" dictates the course of this analysis. *Id.* §§ 404.1520(c), 416.920(c); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

An ALJ will deny a claimant's disability claim if the ALJ does not find that a claimant suffers from a severe impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do "basic work activities." 20 C.F.R. § 404.1520(c). The ability to do "basic work activities" means "the abilities and aptitudes necessary to do most jobs." *Id.* §§ 404.1521(b), 416.921(b).

However, if the impairment is severe, the evaluation proceeds to step three. At step three, the ALJ determines whether the impairment is equivalent to one of several listed impairments that the SSA acknowledges are so severe as to preclude substantial gainful activity. *Id.* §§ 404.1520(d), 416.920(d). An ALJ conclusively presumes a claimant is disabled so long as the impairment meets or equals one of the listed impairments. *Id.* § 404.1520(d).

If the ALJ does not deem a claimant disabled—but before formally proceeding to step four—the ALJ must establish the claimant's Residual Functional Capacity ("RFC"). *Id.* §§ 404.1520(e), 404.1545(a). An individual's RFC is his or her ability to do physical and mental work activities on a sustained basis despite limitations from his or her impairments. *Id.* §§ 404.945(a)(1), 404.1545(a)(1). The RFC analysis considers "whether

[the claimant's] impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what [the claimant] can do in a work setting." *Id.* §§ 404.1545(a)(1), 416.945(a)(1). In establishing a claimant's RFC, the ALJ must assess relevant medical and other evidence, as well as consider all the claimant's impairments, including impairments categorized as non-severe. *Id.* § 404.1545(a)(3), (e). If an ALJ does not conclusively determine a claimant's impairment or combination of impairments is disabling at step three, the evaluation advances to step four.

At step four, the ALJ uses the claimant's RFC to determine whether the claimant has the ability to perform the requirements of his or her past relevant work. *Id.* § 404.1520(f). So long as a claimant has the RFC to carry out his or her past relevant work, the claimant is not disabled. *Id.* § 404.1560(b)(3). Conversely, if the claimant either cannot perform or does not have any past relevant work, the analysis presses onward.

At the fifth and final step of the SSA's evaluation, the ALJ must verify whether the claimant is able to do *any* other work in light of his or her RFC, age, education, and work experience. *Id.* § 404.1520(g). If the claimant is able to do other work, the claimant is not disabled. However, if the claimant is not able to do other work and meets the duration requirement, the claimant is disabled. *Id.* Although the claimant generally continues to have the burden of proving disability at step five, a limited burden of going forward with the evidence shifts to the SSA. At this stage, the SSA must present evidence demonstrating that other work that the claimant can perform—allowing for his RFC, age, education, and work experience—exists in significant numbers in the national economy. *Id.* §§ 404.1520, 1560(c), 416.920, 404.1512(f).

## B.   SSA Hearings and Appeals Process

In accordance with Defendant's delegation, the Office of Disability Adjudication and Review administers a nationwide hearings and appeals program. SSA regulations provide for a four-step process for administrative review of a claimant's application for disability payments. *See id.* §§ 416.1400, 404.900. Once the SSA makes an initial determination, three more levels of appeal exist: (1) reconsideration, (2) hearing by an ALJ,

and (3) review by the Appeals Council. *See id.* §§ 416.1400, 404.900. If the claimant is not satisfied with the decision at any step of the process, the claimant has sixty days to seek administrative review. *See id.* §§ 404.933, 416.1433. If the claimant does not request review, the decision becomes the SSA's—and hence Defendant's—binding and final decree. *See id.* §§ 404.905, 416.1405.

A network of SSA field offices and state disability determination services initially process applications for disability benefits.  The processing begins when a claimant completes both an application and an adult disability report and submits those documents to one of the SSA's field offices. If the SSA denies the claim, the claimant is entitled to a hearing before an ALJ in the SSA's Office of Disability Adjudication and Review. *Id.* §§ 404.929, 416.1429. A hearing before an ALJ is informal and non-adversarial. *Id.* § 404.900(b).

If the claimant receives an unfavorable decision by an ALJ, the claimant may request review by the Appeals Council. *Id.* §§ 404.967, 416.1467. The Appeals Council will grant, deny, dismiss, or remand a claimant's request. *Id.* §§ 416.1479, 404.979. If a claimant disagrees with the Appeals Council's decision or the Appeals Council declines to review the claim, the claimant may seek judicial review in a federal district court. *See id.* §§ 404.981, 416.1481. If a district court remands the claim, the claim is sent to the Appeals Council, which may either decide or refer the matter to another ALJ. *Id.* § 404.983.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff is a 58-year-old woman who alleges to have been too disabled to work between March 25, 2015, and March 22, 2018. (Doc. No. 22 at 4.) On May 7, 2015, Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (AR 34) In both applications, Plaintiff alleged her disability began on March 25, 2015. (*Id.*) On September 17, 2015, the SSA denied these initial applications, and the SSA denied her applications for reconsideration on January 11, 2016. (*Id.*) Plaintiff then requested a

hearing before an ALJ, which occurred on February 22, 2018. (AR 56-71.) The ALJ issued an unfavorable decision on March 21, 2018. (AR 31-33.) The Appeals Council denied Plaintiff's request for review of the unfavorable decision on January 23, 2019. (AR 4-6.) After the Appeals Council's decision, Plaintiff filed a new application for benefits, with a disability start date of March 22, 2018—one day after the ALJ's unfavorable decision. (Doc. No. 22 at 5.) The SSA granted Plaintiff's application on June 11, 2019, with payments commencing in September 2018. (*Id.*) On March 29, 2019, Plaintiff filed the Complaint in the instant case seeking review of the AJL's decision denying her first claim. (Doc. No. 1.) Thus, the case at bar requests reconsideration of her original claim and payment of benefits from March 25, 2015, to August 1, 2018, the month before she was eligible for payments under her second application. (Doc. No. 22 at 6.)

**B.     Administrative Record Overview**

The record begins on March 25, 2015, Plaintiff's alleged onset of disability and when she was involved in a head-on car collision. (AR 237, 244, 387.) After this accident, examining doctors found that Plaintiff could "[m]ove[] all 4 extremities with good strength[,] good range of motion" and that she had "[n]o posterior cervical spine tenderness on palpation." (AR 387.) Despite "[e]xtremities without obvious pain deformity or dislocation except for a minor contusion on the left anterior tibia," doctors kept Plaintiff overnight due to pain. (AR 387-88.) From this visit, her cervical spine CT scans were "[s]omewhat limited due to obesity" but found "[m]ild degenerative change of the atlantoaxial joint without subluxation" and "[d]egenerative disk space narrowing with osteophyte formation" as well as moderate to severe "left sided neural foraminal narrowing" on three of seven vertebrae, resulting in a diagnosis of "multilevel degenerative disk disease without acute bony abnormality." (AR 392.) Her chest, abdomen, and pelvis findings were also limited due to obesity. (AR 393, 399-402, 886-90.) Ultimately, she received a diagnosis of chest wall contusion (AR 853, 862, 871), and the physician "became convinced that she had occult rib fractures on the left lower side anteriorly

because of the degree of pain and the clicking sensation she appreciated on coughing and deep breathing" (AR 856, 861, 869, 877).

After the car accident, Plaintiff experienced unconsciousness, but self-extricated out of the vehicle with the aid of bystanders. (AR 808.) Her pain was 8/10 and present in her left chest wall, left arm, and neck. (*Id.*) Elsewhere in the medical reports, Plaintiff complained only of chest pain, rating it at 5/10 and stating it was right where her seat belt was. (AR 782.) Providers noted that Plaintiff had lived with family, required no assistive devices or equipment, and was independent of mobility assistance prior to admission. (AR 815.) Plaintiff also noted that she was a former smoker. (AR 816.) At one point, physicians were unable to assess Plaintiff's gait, but her extremity movement was "equal," and she was oriented to person, place, and time. (AR 824.)

Physicians also evaluated Plaintiff's fall risk using the Morse Fall Scale[3] on five separate occasions during this hospital stay. (AR 835-36.) She received a score of 35 four times and 45 once, had no history of falls in the last three months, needed either the help of a nurse or no ambulatory aid, had a normal gait four times and a weak gait once, was on an intravenous apparatus during examination, and had secondary medical diagnoses. (*Id.*) Psychosocially, Plaintiff was calm and cooperative throughout. (AR 837-38.)

Between April 24, 2015, and June 1, 2016, Plaintiff saw chiropractor Dr. Brian Garrett seventeen times. (AR 438-65.) On patient questionnaires, Plaintiff marked various pains, depression, sadness, and difficulty walking among other symptoms associated with the accident. (AR 457.) During her first visit, she noted that pain was 6/10, stooping or bending in the wrong position aggravated pain, and using heat and watching how she

---

[3] "The Morse Fall Scale is used to assess how likely it is a person will fall and considers factors such as history of falling, diagnosis, use of ambulatory aide or intravenous line, quality of gait, and mental status." *Mooney v. Comm'r of SSA*, No. EDCV 11-1251-JPR, 2012 U.S. Dist. LEXIS 81517, at *15-16 n.7 (C.D. Cal. June 12, 2012) (citation omitted). "A score of 0-24 indicates no risk of falling, a score of 25-50 indicates a low risk, and a score of 51 or higher indicates a high risk." *Id.*; *see* "Morse Fall Scale," http://www.lb7.uscourts.gov/documents/2-14-CV-4173.pdf

moves improved the pain. (AR 459.) Specifically, she had moderate pain in her neck and lower back and severe pain in her middle back. (AR 461.) Over course of treatment with Dr. Garrett, Plaintiff's condition improved, subjectively and objectively, from experiencing moderate-severe constant pain at 7/10 and moderate pain at 6/10 while bending, lifting, pushing, standing, walking, working, and sleeping on April 24, 2015, to somewhat moderate frequent pain at 5/10 and tolerable pain at 4/10 while completing these tasks on June 1, 2015. (AR 438-54.)

On May 4, 2015, Plaintiff began visiting Saint Vincent De Paul Village ("SVDP") Family Health Center, where her chief complaint was sore throat with blood in sputum. (AR 476.) She noted in her registration form that she was homeless, in fair health, and did not have a disabling condition. (AR 614.) During this visit, Plaintiff also reported an abnormal menstrual cycle as well as "feeling depressed due to homelessness for the past year." (AR 476.) She reported symptoms including feeling sad, appetite disturbance, desire to sleep, loss of interest, low energy, and difficulty focusing. (*Id.*) The doctor prescribed Plaintiff Lexapro, an anti-depressant, as well as Omeprazole for gastroesophageal reflux disease ("GERD"). (AR 477.)

On May 7, 2015, Plaintiff presented to SVDP Village Family Health Center with severe, unresolved cough and coughing up green phlegm. (AR 473, 619.) Plaintiff was alert and oriented x3,[4] showed no gross focal deficits, and her upper respiratory infection appeared viral and improving. (AR 474.) Laboratory readings from this visit showed low iron and ferritin levels, and mostly normal blood panels with a few abnormalities. (AR 479-83.)

---

[4] Alert and oriented x3 is a clinical term "referring to a patient who is responsive to his or her environment (alert), and [1] knows who he or she is, [2] where he or she is, and [3] the approximate time." *Alert and Oriented x 3*, Segen's Med. Dictionary (2012), https://medical-dictionary.thefreedictionary.com/alert+and+oriented+x+3 (last visited July 3, 2020). Similarly, alert and oriented x4 is a clinical term referring to a patient oriented to (1) person, (2) place, (3) time, and (4) events. *AA&Ox4*, https://acronyms. thefreedictionary.com/AA%26Ox4 (last visited July 3, 2020).

On May 13, and 14, 2015, Plaintiff failed to show for appointments as SVDP Village Family Health Centers. (AR 470-71.)

On May 21, 2015, Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income alleging a disability start date of March 25, 2015. (AR 237, 244.) On this same day, the Social Security Field Office completed a disability report, finding that Plaintiff had no difficulties in hearing, reading, breathing, understanding, coherency, concentration, talking, answering, using hands, and writing. (AR 283-85.) However, Plaintiff did have difficulties sitting, standing, walking, and seeing, as during the interview, "after about 45 min[utes] of sitting, [claimant] needed to stand, she stood up slowly and moved around a little bit." (AR 284.) The Field Office also wrote that Plaintiff stopped working because the work stopped and that she would still be working had her previous job not terminated. (*Id.*)

Plaintiff also filed a disability report, where she noted six conditions that limited her ability to work: emphysema, fatty liver, degenerative disk space in neck, hiatal hernia, degenerative disk space in back, and depression. (AR 287.) She also listed five jobs she had held in the past 15 years—CNS, photo tech, caregiver, live-in care giver, and phone receptionist—as well as her current medications: Cetirizine, Flenigin, Flexeril, Lexapro, Morphine, Norco, and Prilosec. (AR 289-90.) Finally, on this same day, the SSA approved Plaintiff's application for California Restaurant Meals Allowance because Plaintiff did not receive meals as part of her living arrangement, and she had no access to a working refrigerator or icebox. (AR 253.)

On May 28, 2015, Plaintiff presented to SVDP Village Family Health Center for a mammogram referral (AR 624) as well as a PAP and Lab flu (AR 467, 629). Her pathology reports showed no signs of chlamydia or gonorrhea (AR 626) and she began oral iron supplementation (AR 628). Plaintiff's doctor also increased her Lexapro prescription at her request. (AR 468.)  The next day, SVDP Village Family Health Center, contacted Imaging Healthcare Specialists to schedule a mammogram for June 10, 2015. (AR 630.)

19-CV-604-JM(WVG)

On June 1, 2015, Plaintiff filled out a function report as well as a work history report, while a friend, Mr. Willie Hayes, filled out a third-party function report on Plaintiff's conditions. (AR 296-331.) In the third-party report, Mr. Hayes noted Plaintiff's breathing problems, back and neck pains, as well as difficulty walking two blocks. (AR 296.) Plaintiff had no personal care problems, needed occasional reminders to take medication, and could prepare light meals and do small loads of laundry. (AR 297-98.) Plaintiff could go out alone, use public transportation, drive, shop once a week, and manage finances alone, although Plaintiff did not show interest in things that she previously enjoyed or spent time with others unless needed. (AR 299-300.) Mr. Hayes then checked that Plaintiff's disability affected various physical movements and that breathing, neck, and back issues were difficult for her. (AR 301.) He stated that she could only walk 2 blocks before taking a 15-30 minutes rest, she did not handle stress well, changes made her emotional, and that he had noticed occasionally fearful and scared behavior. (AR 301-02.) While Plaintiff needed glasses, he did not mark that she needed assistive devices such as a cane or walker. (AR 301.)

Plaintiff's function report is largely the same. She reported back and neck problems preventing her from lifting anything over 10 pounds, as well as issues with walking and sitting for prolonged periods of time. (AR 323.) She described her daily routine as taking a shower, getting dressed, taking medications, and using public transportation to either attend a medical appointment, finding a different place to live, or attending a day program to get help. (AR 324.) Her conditions affected her sleep, she had to sit down and catch her breath while dressing, she easily got tired bathing, and she had difficulties getting off the toilet if it was low. (*Id.*) She sometimes needed reminders to take medication, could prepare meals, and could do laundry but not yard work or heavy cleaning due to shortness of breath. (AR 325-26.) She went outside every day, used public transportation, could drive but did not have a car, could shop in grocery stores although she hated walking in them, and could manage her own finances. (AR 326.) She liked to watch TV but could not anymore due to being homeless and losing interest, and she did not spend time with other people, talking

on the phone for business only. (AR 327.) She sometimes had problems getting along with family, friends, and neighbors, and she did no social activities. (AR 328.) She marked numerous physical limitations and contended that she could only lift ten pounds or less, walk two blocks before needing to rest 15-30 minutes, and pay attention for 30 minutes. (*Id*.) She did not handle stress well and had noticed increases in fear, particularly her view that no one cared for her. (AR 329.) She also noted a need for glasses but no assistive devices such as a cane or walker. (*Id*.) In her work history report, she once again listed the five jobs that she had held in the past 15 years: CNS, live-in care giver, photo tech, caregiver, and phone receptionist. (AR 308.)

On June 10, 2015, Plaintiff presented to Imaging Healthcare Specialists for a mammogram. (AR 651.) Dr. Borso found no suspicious findings in the left breast and found motion artifact and calcification on the right breast, which she recommended another screening in one year. (AR 650-51.)

Between June 20 and 24, 2015, Plaintiff voluntarily presented to the San Diego County Psychiatric Hospital for medication management and symptoms of depression, and poor sleep and appetite, but no suicidal ideations. (AR 588.) Plaintiff stated that she was on Lexapro, which proved unsuccessful, as well as Prozac, which she discontinued taking as she could not tolerate it. (*Id*.) Initially, Plaintiff was very depressed and anxious, had difficulty sleeping, and was tearful when discussing her family; however, she denied any history of hypomanic or manic episodes and her mood slowly improved. (*Id*.) Plaintiff was then told to go to Jane West Center for a mental health follow-up; however, Plaintiff either never made this appointment or it is absent from the record. (AR 589.) Her diagnosis was major recurrent moderate depressive disorder, obesity, fatty liver, hiatal hernia, back pain, and problems with her primary support group, her social environment, housing, economics, and access to healthcare. (*Id*.) Her GAF was assessed at 50.[5] (AR 590.) Upon discharge,

---

[5] A GAF score is a point-in-time snapshot assessment of an individual's level of functioning, useful in planning treatment. Am. Psychiatric Ass'n, Diagnostic & Statistical

Plaintiff was pleasant and cooperative, alert and oriented x3, had a better mood, was euthymic, and had no delusional thinking. (AR 588.) She once again denied suicidal or homicidal ideations or hallucinations, her cognition was grossly intact with good insight and judgment, and she was future oriented with an improved mood. (AR 588-89.)

On July 2, 2015, Plaintiff voluntarily presented to San Diego County Psychiatric Hospital feeling anxious after having sudden anxiety or panic attacks in the days prior to admission. (AR 591.) Initially, Plaintiff was "extremely overwhelmed and anxious, very tearful, breathing rapidly with shallow breath, moaning and sucking her thumb and writing down her communication saying she was unable to speak." (*Id.*) After spending the night, Plaintiff reported feeling better, hopeful, and ready to go home, having better understood what happened to her. (*Id.*) specifically, because Plaintiff had stopped taking Prozac due to a bad reaction, residual Prozac in her system may have caused these panic attacks. (*Id.*) At time of discharge, Plaintiff was well-groomed with normal behavior aside from a blinking tic, mildly anxious at times but generally euthymic, linear and logical thought process, no suicidal or homicidal ideation, no auditory or visual hallucinations, no evidence of any delusions, fair insight and judgment, and alert and oriented x4 cognition. (*Id.*) Plaintiff received a diagnosis of major depressive disorder, single episode, moderate, emphysema, chronic neck pain, problems with primary support group, problems related to social environment, housing problems, and a GAF score of 55-60. (AR 592.)

---

Manual of Mental Disorders (DSM-IV) 32-34 (4th ed., 1994). GAF scores include a significant number of non-medical factors, such as financial and legal troubles, which do not constitute work-related functional limitations resulting from medical impairments. *Id.* at 33. A GAF between 61 and 70 reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.* at 34. A GAF between 51 and 60 reflects "[m]oderate symptoms (e.g., depressed mood and mild insomnia) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *Id.*

On July 7, 2015, Stace Little, PA-C, at Family Health Centers of San Diego processed Plaintiff's information and stated that Plaintiff requested BuSpar, an anti-depressant, after forgetting to ask for a refill at her shelter. (AR 1083.) Her problem list included depression. (AR 1084.)

On July 22, 2015, Plaintiff voluntarily presented to San Diego County Psychiatric Hospital with the chief complaint of "I don't know, I keep hitting myself on the head." (AR 594.) Plaintiff was tearful, anxious, and covered with a blanket but eventually calmed herself down. (*Id.*) After Plaintiff slept, the doctor attempted to see her, but she proved noncompliant, telling the doctor to come back later as she was eating lunch, but then she fell asleep afterwards. (*Id.*) "After much convincing" Plaintiff opened to her difficulties living at a homeless shelter and began once again to pat herself on the head. (*Id.*) Plaintiff requested extra days in the hospital and did "not appear to be in acute medical distress." (AR 595-96.) At time of discharge, Plaintiff made poor eye contact, was indifferent about the interview, and was "dismissive of writer." (AR 595.) Plaintiff was "preoccupied with staying in the hospital and attaining certain medications" but exhibited no paranoia, delusions, obsessions, or hallucinations. (*Id.*) Impulse control was limited but it "appear[ed] that her actions [were] volitional in nature." (*Id.*) She received a diagnosis of anxiety disorder not otherwise specific, depressive disorder not otherwise specified, problems with primary support group, problems related to social environment, other psychosocial and environmental problems, and received a GAF score of 50-55. (AR 596.) While Plaintiff denied any threat to hurt herself or others on discharge, the providers noted that "suicide is a chronic risk for this patient." (*Id.*)

On this same day, after release from the psychiatric hospital, Plaintiff presented to Family Health Centers for the first time with depression. (AR 1080.) Plaintiff had no fatigue or shortness of breath, and appeared alert and oriented, well nourished, well developed, and in no distress. (*Id.*) Dr. Hazelbaker noted that plaintiff was obese with "[g]rossly normal range of motion," no "ext edema," "[n]ormal strength and muscle tone,

normal gait, [and] no gross deficits noted." (AR 1081.) Plaintiff's problem list included depression and knee joint effusion. (AR 1082.)

Between August 6 and August 11, 2015, Plaintiff stayed at the San Diego County Psychiatric Hospital with suicidal ideations and the chief complaint, "I am thinking about taking an overdose." (AR 598.) Plaintiff had a very angry, frustrated, and agitated demeanor, began hitting her head, and reported symptoms of depression including poor appetite, lack of energy and motivation, and eventual suicidal thoughts and plan. (*Id.*) Additionally, she seemed to have been dismissed from her shelter due to confrontation with peers. (*Id.*) Her mood was dysphoric, and she showed anger, hostility, and discernment to her colleagues at the shelter as well as staff at the hospital. (*Id.*)

At the time of discharge, Plaintiff was "somewhat irritable but in fair control of her impulses with no indication of imminent agitation or aggressive behavior." (*Id.*) She also had a stable mood and affect and denied suicidal ideation, although her social and coping skills remained limited while her insight into her emotional problems remained poor. (*Id.*) Her prognosis was "[g]uarded to poor due to her frequent recurrence of signs and symptoms, and lack of insight as well as poor support system around her." (AR 599.) Plaintiff received a diagnosis of bipolar mood disorder, mixed, intermittent explosive disorder, mixed personality disorder, anemia, GERD, hiatal hernia, history of chronic obstructive pulmonary disease ("COPD"), and psychosocial stressors, severe, including problems with primary support group, housing problems, economic problems, problems related to interaction with legal system, and other psychosocial and environmental problems, chronic physical conditions. (AR 600.) Her GAF score was 45. (*Id.*)

On August 12, 2015, Plaintiff presented to Dr. Soliman at Seagate Medical Group for a complete psychiatric evaluation at the request of the Department of Social Services. (AR 487.) Plaintiff drove herself to the evaluation and the source of information for the evaluation was the Plaintiff and any accompanying records provided. (*Id.*) Dr. Soliman noted that Plaintiff "appeared distracted during the interview" with normal gait and posture and no involuntary movements noted. (*Id.*) Plaintiff's chief complaint was depression,

19-CV-604-JM(WVG)

which she stated she had suffered for a few years and had been getting worse due to physical problems, homelessness, and the inability to provide for herself. (AR 487-88.) Plaintiff reported auditory hallucinations, paranoid ideations, and that she is unable to work due to her condition. (AR 488.) Plaintiff reported having a college degree, although this is not corroborated elsewhere in the record. (AR 489.) Dr. Soliman noted that Plaintiff could cook, clean, do shopping and errands, take care of hygiene, take care of financial responsibilities, drive a car, get along well with family, friends, and neighbors, and have difficulty concentrating on daily activities. (*Id.*) Plaintiff's "speech was soft and of decreased rate and rhythm, but coherent and relevant" and she maintained eye contact. (AR 490.) Plaintiff was alert and oriented, "able to recall one of three objects in five minutes, [had intact digit span forwards and backwards, and] was not able to do serial sevens." (*Id.*) She correctly answered abstract thinking questions, such as identifying similarities and understanding proverbs, and she showed good insight and judgment. (*Id.*) Her mood was depressed, her affect was congruent, she denied suicidal or homicidal ideations, and her "[n]eurovegetative signs and symptoms were significant for decreased concentrations and decreased energy." (*Id.*) Plaintiff admitted to auditory hallucinations and paranoid ideation, although she showed no looseness of associations, thought withdrawal, or evidence of visual hallucinations. (AR 490-91.) Plaintiff received a diagnosis for major depression, severe with psychotic features, emphysema, back pain, hiatal hernia, obesity, lack of social support and a GAF of 50. (AR 491.) Additionally, he assigned her a guarded prognosis and stated that she could manage funds. (*Id.*) His medical opinion was as follows:

> From a psychiatric standpoint, the claimant is able to understand, carry out, and remember simple instructions, but not complex instructions. The claimant is unable to interact with co-workers, supervisors, and the general public. The claimant is unable to withstand the stress and pressures associated with an eight-hour workday, and day-to-day activities . . . . This is a 54-year-old female with a history of depression. The claimant is currently under psychiatric treatment. Despite treatment she continues to have significant symptoms of psychosis and depression. The claimant would benefit from

1    maintaining treatment. Her current symptoms are interfering with her inability
2    [*sic*] to focus or concentrate on her daily activities.

3    (AR 491-92.)

4        On August 16, 2015, Plaintiff arrived at Scripps Mercy Hospital by ambulatory
5    means with the chief complaint of a headache. (AR 913.) She was unable to describe a
6    pattern to these headaches, rated the pain at a 1/10, denied neck pain or stiffness, was
7    sleeping comfortable in the room when the doctor entered, and had no dizziness, difficulty
8    ambulating, or difficulty word finding. (AR 913.) Plaintiff denied tobacco use, did not
9    appear to be in any distress, had no edema, was alert and oriented, had 5/5 strength with
10   normal bulk and tone in upper and lower extremities, and had a steady ambulatory gait.
11   (AR 914.) Upon discharge, Plaintiff's headache was 0/10, she felt much better overall, and
12   she had a steady gait and a nonfocal, nonlateralizing neurological exam. (AR 915-16.)

13       On August 28, 2015, Plaintiff presented to the Emergency Room at UCSD Medical
14   Center with epigastric pain, having vomited all night. (AR 555.) Plaintiff noted no nausea
15   but admitted to having needed surgery for this vomiting issue when she lived in Texas;
16   however, she did not have insurance at that point to address it. (*Id.*) An examination
17   revealed no chest pain, no shortness of breath, no depressed mood, racing thoughts, or
18   thoughts of self-harm, and no spinning sensation. (AR 555-56.) Plaintiff was obese with
19   no spinal tenderness, no edema, was awake, alert and oriented, had normal speech, had
20   normal coordination with strength at 5/5 for all four extremities, and had appropriate
21   psychology. (AR 556.) Plaintiff then had blood work done and completed a urine test, both
22   of which showed mostly normal results with a few abnormalities. (AR 549-50, 556-58.)
23   Plaintiff additionally had a chest x-ray, which found low lung volumes and no evidence of
24   acute cardiopulmonary disease. (AR 551.) Plaintiff ultimately received a diagnosis of non-
25   intractable vomiting without nausea, vomiting of unspecified type, and hiatal hernia. (AR
26   560.)

27       On September 1, 2015, Plaintiff presented to Family Health Centers for Health
28   Education Progress Notes. (AR 532.) Plaintiff was obese at 284 pounds and her physical

19-CV-604-JM(WVG)

activity consisted of walking daily for 30 minutes. (*Id.*) Plaintiff's receptivity and motivation were both "good" and she had no barriers to learning. (*Id.*) The provider also wrote the following:

> Pt lives upstairs in Connections rooms and provide [*sic*] 2 meals to residents. Pt does not eat at facility often due to not liking the food there, so pt eats out often at fast foods. Walks with pain and use cane and walker. Pt has 2 meals per day on average with inadequate intake of healthy proteins/fats and vegetable. Has fruit on occasion and is aware of carbs and weight. Pt Pt [*sic*] with ok labs and no TGT . . . .

(*Id.*) The provider also recommended that Plaintiff find a suitable apartment with kitchen facilities, have fruit whenever available, eat vegetables daily, drink water instead of Gatorade, adhere to portion sizes, and try sitting down exercises. (*Id.*) He also scheduled a follow-up appointment for November 5, 2015. (AR 532-33.)

On September 3, 2015, Plaintiff had blood work done at Downtown Connections Family Health Centers, showing mostly normal readings with some abnormalities. (AR 503-04.) On the same day, Plaintiff presented to Family Health Centers with iron deficiency anemia, depression, and hyperlipidemia. (AR 1077.) Plaintiff denied suicidal or homicidal ideations or hallucinations, slept fine at the shelter, and was applying for housing through PATH, a homelessness service. (*Id.*) Physician Assistant Little found Plaintiff obese with a BMI of 45.4 and a mental status that was alert and oriented x4 with affect appropriate as well as good judgment and insight. (*Id.*) Plaintiff's problem list included hyperlipidemia, iron deficiency anemia, and obesity. (AR 1078.)

On September 9, 2015, Plaintiff presented to Family Health Centers with simple diaphragmatic hernia, obesity with a BMI of 46.8, and vomiting, likely due to her hiatal hernia which needed surgery. (AR 1075.) Physician Assistant Little found Plaintiff obese with normal gait and her problem list included simple diaphragmatic hernia and vomiting. (AR 1076.)

/ / /

/ / /

On September 14, 2015, Plaintiff presented to Dr. Garrett for chiropractic treatment to address her lower-back spine pain; however, no treatment notes from this visit are present in the record. (AR 674.)

On September 15, 2015, Plaintiff presented to Family Health Centers for an initial Client Treatment Plan with chronic depression with anxiety symptoms of nightmares, flashbacks, panic attacks, excessive scratching of skin, lethargy, and lack of interest and of appetite. (AR 534.) Plaintiff also reported a significant decrease in concentration and focus, as well as increased physical symptoms since her car accident with hernia, back, knee, and pelvic pain as well as difficulty breathing. (*Id.*) The providers' goals were to increase Plaintiff's ability to manage emotions and decrease negative coping techniques, desensitize negative cognition connected to trauma of her mother's death and car accident, and provide health behavioral and cognitive coping techniques to improve Plaintiff's self-worth and physical health. (*Id.*) The provider noted that Plaintiff was compliant although she had years of undiagnosed depression, showed lethargic symptoms—she almost fell asleep in session—, lived in shelters, had some emotional and financial support from a godmother in Texas, had flashbacks to her mother's accidental death by fire, had PTSD symptoms when getting into a car, had nightmares from the accident, lacked interest, and lost her appetite. (AR 535.) She also noted trauma history that included child abuse, sexual abuse, and other issues. (*Id.*) Plaintiff reported no suicidal or homicidal ideations, or fleeting thoughts, and she reported no personal substance abuse. (*Id.*) Plaintiff was homeless, living in a residential facility, reported prior employment as a CNA in Texas, and stated her source of income was food stamps. (AR 536.) Plaintiff's physical health issues included hernia, anemia, acid reflux, influenza with inhaler, obesity, and chronic pain syndrome and chronic fatigue syndrome in the knees, back, and ankles. (*Id.*) In a mental exam, Plaintiff's level of consciousness was lethargic, she was oriented to the current situation, had good hygiene, was appropriately dressed, and appeared overweight. (AR 537.) Her speech was normal, her thought process coherent, her behavior cooperative, her affect blunted, her intellect age appropriate, her mood depressed, her motor slowed, her judgment fair, and

her insight fair. (AR 537-38.) Her GAF was listed at 55, and Plaintiff reported her strengths as being a "trustworthy, good person" who "like[d] to help people." (AR 538.)

On September 17, 2015, Plaintiff presented to Family Health Centers for health education counseling. (AR 1070.) She was obese with a BMI of 47.3. (*Id.*)

On this same day, the SSA denied Plaintiff benefits, stating that while she was "not capable of performing work [she did] in the past, [she is] able to perform work that is less demanding." (AR 128.) Also on this day, Dr. Rudnick assessed Plaintiff's medical conditions for the SSA with a Disability Determination Explanation for both Plaintiff's DIB and DI claims. (AR 72-97.) In these near identical documents, Dr. Rudnick used Plaintiff's self-reported weight of 240 pounds and noted that she was closely approaching advanced age. (AR 72.) Her health conditions included emphysema, fatty liver, degenerative disk space in the neck, hiatal hernia, degenerative disk space in the back, and depression. (*Id.*) The evidence Dr. Rudnick used included records from Seagate Medical Group, Palomar Medical Center, work history and function reports, Dr. Garrett, and SVDP Village Family Health Center. (AR 73-75.) He noted that a consultative examination was required, as the evidence as a whole was not sufficient to support a decision on the claim. (AR 75.)

In response to the claim in the medical records that Plaintiff could not withstand the stress of a full workday, Dr. Rudnick provided that this assessment "may be overly restrictive as [Plaintiff] did drive herself, advocates for herself, and her primary complaints are about her physical issues." (AR 76.) Dr. Rudnick further opinioned that "[n]o cognitive difficulties were observed on a face-to-face interview. She dcan [*sic*] drive, shop, manage money and reports a difficulty with concentrating." (AR 77.) Plaintiff had "a medically determinable severe mental impairment that does not meet or equal a listing and would be rated under 12.04" and that her allegations "are partially credible." (*Id.*) Plaintiff's medically determinable impairments included non-severe emphysema and disorders of back-discogenic and degenerative and severe affective disorders. (*Id.*) Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social

functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (AR 78.) Dr. Rudnick also noted that an RFC assessment was necessary. (*Id.*) When assessing credibility, he found Plaintiff's claims as partially credible because "evidence in file does establish the existence of a condition, however it is not to the severity level alleged." (*Id.*) In regard to Dr. Soliman's opinion, he stated that it was "too restrict when compared to treatment history and information." (AR 79.) Additionally, this opinion "relies heavily on the subjective report of symptoms and limitations provided by the individual, and the totality of the evidence does not support the opinion" and is thus an "overestimate of the severity of the individual's restrictions/limitations and based only on a snapshot of the individual's functioning." (AR 82.) For Plaintiff's mental residual functional capacity, Dr. Rudnick marked that Plaintiff had understanding and memory limitations and that the ability to remember locations and procedures was not significantly affected, her ability to understand and remember very short and simple instructions was not significantly affected, and that her ability to understand and remember detailed instructions was moderately limited because she could only understand and remember three and four step uncomplicated instructions. (AR 79-80.) Plaintiff also had sustained concentration and persistence limitations, with her ability to carry out very short and simple instruction, her ability to maintain concentration for extended periods, her ability to sustain an ordinary routine without special supervision, and her ability to make simple work-related decisions not significantly affected. (AR 80.) However, her ability to carry out detailed instruction, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, work in coordination with or in proximity to others without being distracted by them were moderately limited. (*Id.*) So too were her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*) However, he did note that Plaintiff could persist, attend, and maintain acceptable pace for a normal work schedule. (*Id.*)

Plaintiff also had social interaction limitations, with her ability to ask simple questions or request assistance, her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were not significantly affected. (AR 80-81.) However, her ability to interact appropriately with the general public and her ability to accept instructions and respond appropriately to criticism from supervisors was moderately limited. (*Id.*) Plaintiff also had adaptions limitations with her ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, set realistic goals or make plans independently of others were not significantly affected, while her ability to respond appropriately to changes in the work setting were moderately limited. (AR 81.) Finally, Dr. Rudnick found that Plaintiff did not have the appropriate RFC to perform her past relevant work of phone receptionist, photo tech, live-in care giver, or CNS. (AR 82-83.) However, three workable occupations with significant number of jobs in the national economy included collator operator, cleaner/housekeeping, and photocopy-match operator. (AR 82-83.) Ultimately, Dr. Rudnick opined Plaintiff was not disabled. (AR 83.)

On September 21, 2015, Dr. Garrett filled out a Verification of Physical/Mental Incapacity, deeming Plaintiff unable to perform work due to a disability. (AR 673.) He stated that Plaintiff had not yet submitted a disability insurance application for completion and that Plaintiff's incapacity will either end or require re-evaluation through October 23, 2015. (*Id.*) He marked that Plaintiff could not garden or perform restricted sedentary/clerical work, although she could take care of herself. (*Id.*)

On September 30, 2015, Plaintiff presented to UCSD Medical Center as a new patient for nausea and vomiting. (AR 561.) Dr. Rivera-Nieves described Plaintiff as "obese and homeless . . . with no lab abnormalities except for mild ALT elevation." (*Id.*) Plaintiff was a former smoker, had no trouble breathing, no chest pain, and no back pain, but she did have pain in the abdomen. (AR 562.) Plaintiff appeared in no apparent distress, had normal respiratory effort, no peripheral edema, had all motor strength grossly intact, was

alert and oriented x3, presented with no anxiety or depression, and had normal affect. (AR 563.) Ultimately, Plaintiff received a diagnosis of nausea and vomiting, vomiting of unspecified type, and epigastric pain, while the doctor planned to remove gallstones and schedule an esophagogastroduodenoscopy to remove ulcers and gastritis. (AR 564.)

On October 1, 2015, Plaintiff presented to Family Health Centers with edema, pain in her lumbar spine, and obesity with a BMI of 47.8. (AR 1067.) She reported weight gain due to her low back pain—rating at 7/10—and that walking uphill "killed" her back. (*Id.*) Additionally, Physician Assistant Little found Plaintiff to be obese with a slow gait and an alert and oriented mental status. (*Id.*) Plaintiff's problem list included edema and pain in the lumbar spine. (AR 1068.) On this same day, Plaintiff also presented to Imaging Healthcare Specialists at Ms. Little's request to address Plaintiff's chronic low back pain. (AR 541.) Dr. Tobin found mild spondylosis at the T12-L1 and at L4-L5 as well as moderately narrowed disc spaces at L4-5. (*Id.*) He diagnosed Plaintiff with spondylosis and disc degenerative change with no acute findings. (*Id.*)

On October 7, 2015, Plaintiff presented to Family Heath Centers for a Psychiatric/Medication Evaluation. (AR 529.) Plaintiff reported a history of panic attacks "for no reason sometimes, even being in the rain." (*Id.*) Plaintiff denied drug abuse and suicidal ideations, and reported to seeing St. Vincent Clinic in April 2015, for psychiatric care. (*Id.*) Her history also included a psychiatric hospital admittance between June and July 2015 for a panic attack, hallucinatory side effects to Prozac, and ineffectiveness of Lexapro. (*Id.*) Her medical history included obesity, she admitted to living at a homeless shelter, and her sister was bipolar. (*Id.*) Plaintiff's behavior was cooperative, her speech was within normal limits although also childlike, her language was articulate, her thought process linear, her associations appropriate, her thought content normal, and she experienced no delusions, suicidal ideations, or homicidal ideations. (AR 530-31.) She was alert and oriented x4 although her judgment/insight was impaired, her fund of knowledge was limited, her attention span/concentration was fair, and her recent/remote memory was fair. (AR 531.) Her mood/affect was anxious, dysphoric, slowed down, and tired. (*Id.*) Dr.

Cerda diagnosed Plaintiff with bipolar and generalized anxiety disorder, and noted that she was "[u]nable to complete [the evaluation] because [Plaintiff] became very distraught when I reviewed her labs and meds, began rocking, pulling her hair, punching haer [*sic*] face and sucking her thumb to 'comfort myself.'" (*Id.*) She added that Plaintiff "was minimally responsive verbally and kept repeating she was just 'overwhelmed.'" (*Id.*) Plaintiff also stated, "[e]verything [is] going wrong and before I used to be healthy. I used to play basketball my whole life and there was nothing wrong with me. Now look at me." (*Id.*) Dr. Cerda adjusted Plaintiff's medications and scheduled a one-week follow-up appointment. (*Id.*)

On October 7, 2015, a UCSD Medical Center radiology report of Plaintiff's abdomen found an enlarged fatty liver and no sonographic evidence of cholelithiasis or cholecystitis. (AR 552.) The next day, Family Health Centers called Plaintiff via phone to discuss her whereabouts after she checked into the clinic as a walk-in patient but then left and did not return. (AR 1065.) Plaintiff stated that she returned to PATH housing because she had to wait to see the doctor. (*Id.*) Providers furnished Plaintiff with information for self-harm intervention, although she denied suicidal ideations and agreed to come to the clinic the next day if needed. (*Id.*)

On October 13, 2015, Plaintiff presented to Family Health Centers for a psychiatric follow-up appointment. (AR 528.) Compared to the last appointment, where Plaintiff's cooperation was minimally responsive, this time Plaintiff was "much more calm and coherent." (*Id.*) Plaintiff stated: "I'm feeling better. I just get really overwhelmed. I'm super stressed because I don't think I can work right now and it's required I have to look for work. I was a CNA before." (*Id.*) Dr. Cerda noted that Plaintiff was sleeping better although she was still sad, tearful, and easily overwhelmed. (*Id.*) Plaintiff denied suicidal and homicidal ideations, and had a cooperative behavior, speech within normal limits, articulate language, a linear and coherent thought process, appropriate associations, normal thought content, and no delusions. (AR 528-29.) Plaintiff was alert and oriented x4, exercised appropriate judgment and insight, fund of knowledge, attention span and concentration, recent and

remote memory, and her mood and affect was anxious and improving. (AR 529.) Dr. Cerda diagnosed Plaintiff with bipolar and generalized anxiety, found that she was more stable that day, and adjusted her medications, noting to "[m]onitor for mania." (*Id.*) She also scheduled a two-week follow-up appointment. (*Id.*)

On this same day, Family Health Centers refilled Plaintiff's Protonix prescription to treat her GERD. (AR 1063.) Additionally, Plaintiff reported that compression stockings helped her edema, but "she need[ed a] letter to elevate her feet above her heart at PATH during the day." (*Id.*) Physician Assistant Little also found that Plaintiff was obese with a BMI of 47.6 and a slow gait. (*Id.*) Plaintiff's problem list included depression. (AR 1064.)

On October 20, 2015, Plaintiff presented to Imaging Healthcare Specialists for a sonographic examination of her abdomen. (AR 655.) Dr. Buckley diagnosed Plaintiff with echogenic liver consistent with fatty liver versus fibrosis, and he found no mass or acute abnormality. (*Id.*)

On October 21, 2015, Plaintiff presented to Imaging Healthcare Specialists at the request of Physician Assistant Little. (AR 540.) Dr. Tobin performed a Doppler and spectral analysis ultrasound of Plaintiff's deep venous system to address her calf swelling and deep vein thrombosis. (*Id.*) He found no visible thrombi in the deep venous system, normal compressibility, and no evidence of superficial thrombophlebitis. (*Id.*)

On October 28, 2015, Plaintiff had an endoscopy report conducted at UCSD Medical Center for her nausea. (AR 553-54.) The findings indicated normal esophagus, large amount of retained food in the stomach, and a normal duodenum. (AR 554.)

The next day, Plaintiff presented to Family Health Centers for a psychiatric follow-up. (AR 526.) Plaintiff denied suicidal ideation and homicidal ideation, and stated, "I've been crying and sad, and I don't understand why." (*Id.*) She also slept great with her Seroquel prescription, although she contended that weight gain was a side effect. (*Id.*) Plaintiff experienced no delusions, and her behavior was cooperative, her speech was within normal limits, her language was articulate, her thought process was both linear and coherent, her associations were appropriate, and her thought content was normal. (*Id.*) She

was alert and oriented x4, and she exercised appropriate judgment/insight, fund of knowledge, attention span/concentration, and recent/remote memory. (AR 527.) Her mood was depressed, restricted, and tired. (*Id.*) Plaintiff received a diagnosis of bipolar and generalized anxiety disorder and had adjustments made to her medication. Dr. Cerda recommended a follow up in one month; however, the record either does not contain this appointment or Plaintiff did not appear for the appointment. (*Id.*)

On November 5, 2015, Plaintiff submitted a second function report, filled out with the help from a third party. (AR 332.) She noted lack of focus and energy due to depression as well as back and neck pain and emphysema that made walking and standing difficult. (*Id.*) Her daily routine included attending appointments with doctors and social service agencies. (AR 333.) She had sleep difficulties as well as difficulty reaching down when dressing or bathing. (*Id.*) She sometimes needed reminders for taking medication and for personal care, and this time she contended that she could not prepare meals. (AR 334.) Plaintiff noted light cleaning as a household chore she partook in 15 minutes daily. (*Id.*) She further stated that she went outside daily and used public transportation, drove a car, or walked. (AR 335.) Plaintiff shopped in grocery and clothing stores for two hours once a month and could manage her finances independently. (*Id.*) She enjoyed art, basketball, and baseball, and did art about once per month although she was unable to play sports. (AR 336.) This time, she stated that she spent time with others talking or going out to eat about once a month. (*Id.*) Depression made her isolate, and she had difficulty lifting heavy weight, bending, standing, and walking due to degenerative discs in her neck and back. (AR 337.) This time, she stated that she could only walk one block before needing to rest 10-15 minutes. (*Id.*) She could follow written instructions average and spoken instructions well, and she did not get along with authority figures, although she had never been fired or laid off from employment due to problems getting along. (AR 337-38.) This time she stated that she handled change in routine well, although her anxiety could become overwhelming and make her manic. (AR 338.) She used glasses but noted no need for any other assistive device such as a cane or walker apart from marking support hosiery for vascular veins. (*Id.*)

In a pain questionnaire filled out the same day, Plaintiff noted daily neck and back pain having started in 2003. (AR 340.) It was brought on by walking long distances, standing for long periods of time, and bending and stooping; however, resting 30 minutes relieved pain. (*Id.*) Plaintiff noted no use of assistive devices in relieving the pain, and she noted that she could walk one block, stand 15 minutes, and sit for one hour, as well as drive a car, use public transportation, and complete light housekeeping chores. (AR 342.)

On November 17, 2015, Plaintiff filed a request for reconsideration with the Social Security Department. (AR 134.) The next day, the Social Security Field Office completed another disability report on Plaintiff; however, this report was largely left blank noting her alleged onset date of March 25, 2015. (AR 343-44.)

On December 1, 2015, Plaintiff submitted a second disability report for reconsideration. (AR 345-53.) She noted no change to the physical and mental conditions she reported earlier; however, she added post-traumatic stress disorder ("PTSD") and anxiety as new a new physical or mental condition. (AR 346.) Her current medications were Buspar; Effexor; Saphris; and Seroquel for anxiety, depression, and mood; and Neurontin for pain. (AR 350.)

On December 18, 2015, Plaintiff had a gastric emptying study conducted at UCSD Medical Center, which found normal emptying. (AR 552-53.)

On December 23, 2015, Plaintiff presented to Family Health Centers with knee pain, hyperlipidemia, obesity, GERD, pain in lumbar spine, and edema. (AR 1058.) Her BMI was 48.3 and Physician Assistant Little stated that Plaintiff is "trying to loose [*sic*] weight and saw nutritionist once and does not plan on going back." (*Id.*) Examination notes also noted that Plaintiff took Gabapentin for her back, was "doing well," and declined physical therapy. (*Id.*) The notes state that Plaintiff was obese with normal gait, and her problem listed included depression, edema, hyperlipidemia, iron deficiency anemia, knee joint effusion, knee pain, pain in lumbar spine, and PTSD. (AR 1059-61.)

On January 11, 2016, the SSA denied Plaintiff's reconsideration request, finding that her statements regarding work limitations were not fully supported by the record; she could

walk and move about satisfactorily; she had no loss of control or muscle wasting in her arms and legs; she was still able to do work activities; she was able to think, communicate, and act in her own interest; she could adjust to ordinary emotional stresses; get along with others; do her usual activities; and remember and follow basic instructions. (AR 136-37.)

On this same day, Dr. Payne-Gair assessed Plaintiff's medical conditions for the Social Security Administration in a Disability Determination Explanation to reassess Plaintiff's DIB and DI claims. (AR 100-27.) She noted no change in Plaintiff's previous medical conditions but listed PTSD as a new condition. (AR 101.) The record evidence included reports from UCSD Medical Center, function reports, pain questionnaires, and all evidence previously used in the first determination. (AR 101-04.) Additionally, she requested evidence from Dr. Brian Garrett, UCSD Medical Center, and Downtown Family Health Center and stated that a consultative examination was not required. (AR 104.) Dr. Payne-Gair concurred with Dr. Rudnick's earlier findings regarding Plaintiff's and Dr. Soliman's credibility as well as Plaintiff's restrictions in her residual function capacity. (AR 105-09.) However, Dr. Payne-Gair did differ from Dr. Rudnick by finding that Plaintiff's ability to maintain attention and concentration for extended periods of time was moderately limited, rather than not significantly limited (AR 107); her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances was not significantly limited, rather than moderately limited (*id.*); her ability to work in coordination with or in proximity to others without being distracted by them was not significantly limited, rather than moderately limited (AR 108); and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was moderately limited, rather than not significantly limited (*id.*). In addition, Dr. Payne-Gair found that Plaintiff could understand and remember simple instructions, complete simple tasks, maintain attention and concentration for periods of at least two hours, complete a normal workday and workweek without significant psychologically related interruptions, perform at a consistent pace, relate appropriately to peers and supervisors, and adapt to routine change in the workplace. (AR 109.) Finally, she found that Plaintiff

could not complete her past relevant work, concurred with Dr. Rudnick on the three occupations she could potentially perform, and found Plaintiff not disabled. (AR 109-11.)

On April 5, 2016, Plaintiff presented to Scripps Mercy Hospital with the chief complaint of left heel pain resulting from having stepped off a curb a week earlier. (AR 917.) Plaintiff was well-nourished, alert and oriented, and had no edema. (AR 918.) Emergency department tests showed no evidence of fracture but rather a heel spur on the left foot. (*Id.*)

On April 7, 2016, Plaintiff presented to Family Health Centers with sleep apnea, lower extremity edema extant for one year, and a BMI of 48.9. (AR 1053.) Plaintiff also reported experiencing the following symptoms: snoring; nocturnal choking or gasping; daytime sleepiness; fatigue/tiredness; falling asleep while reading, watching TV, and driving; moodiness or irritability; lack of concentration; memory impairment; decreased libido and impotence; and depression. (*Id.*) Plaintiff's mental status was alert and oriented x4, and her problem list included depression, diabetes, edema, hyperlipidemia, iron deficiency anemia, knee joint effusion, obesity, obstructive sleep apnea, and pain in lumbar spine. (AR 1054-55.)

On April 14, 2016, Plaintiff presented to Family Health Centers for lab results from a hernia test. (AR 1049.) She denied shortness of breath, was obese with a BMI of 50.6, had a normal gait, and was alert and oriented x4. (*Id.*) Physician Assistant Little stated that Plaintiff needed to lose weight, follow up with the surgeon to send her a report, and receive a knee x-ray. (AR 1050.) Plaintiff's problem list included diabetes, GERD, PTSD, a needed colon cancer screening, and tobacco use. (*Id.*)

On April 28, 2016, Plaintiff presented to Family Health Centers for health education counseling. (AR 1047.) Plaintiff had a BMI of 50.6 and she also had a follow-up for diabetes, obesity, hyperlipidemia, smoking, and GERD. (*Id.*)

On May 10, 2016, Plaintiff requested a hearing before an Administrative Law Judge because she alleged, "I am still disabled and unable to work." (AR 143.)

19-CV-604-JM(WVG)

1    On May 11, 2016, Plaintiff presented to Family Health Centers with left heel pain

2 and a BMI of 50.4. (AR 1043.) Plaintiff reported pain with weight bearing that worsened

3 with the first step of the day or when standing after sitting too long. (*Id.*) She also noted

4 that she had been told it was a heel spur, her foot often swelled, and that over-the-counter

5 pain medications did not help. (*Id.*) Plaintiff's problem list included benign hypertension,

6 diabetes, plantar fasciitis, needed colon cancer screening, tobacco use, and needed

7 vaccinations. (AR 1044-45.)

8    On May 14, 2016, Plaintiff presented to UCSD Health after being involved in a

9 second car accident. (AR 690.) Due to Plaintiff's left wrist pain, she received x-rays on this

10 area which found slight bowing of the pronator fat pad although no definitive acute osseous

11 abnormality of the left wrist. (*Id.*) A chest x-ray revealed no acute findings. (AR 690-91.)

12 A knee x-ray found "[m]ild to moderate tricompartmental osteoarthrosis, most pronounced

13 in the medial femorotibial compartment as characterized by joint space narrowing and

14 osteophytes." (AR 691.) There was no acute osseous abnormality of the left knee but mild

15 to moderate tricompartmental osteoarthrosis, most pronounced in the medial femorotibial

16 compartment. (*Id.*) Hand x-rays were limited to two views but found no radiographic

17 evidence of acute fracture or malalignment of the left wrist, hand, forearm, and elbow,

18 although they did find mild degenerative changes of the thumb joint with a small ossicle.

19 (*Id.*) Elbow x-rays found no acute fracture. (AR 694.) Likewise, forearm x-rays found no

20 acute fracture. (AR 695.) A later wrist x-ray with three views found "[s]light dorsal position

21 of the ulna without significant widening of the distal radioulnar joint," although there was

22 no acute fracture. (AR 695-96.)

23    On May 16, 2016, Plaintiff presented to UCSD Health with the chief complaint of

24 left knee pain, which began without precipitating event since at least 2008 and worsened

25 due to the car accident two days prior. (AR 697.) Plaintiff described her pain as 3/10 that

26 worsened with standing and walking although improved with rest and medication. (*Id.*) An

27 18-point review of systems was "positive for breathing problems, digestion problems,

28 diabetes, numbness and tingling, psychological problems[,] and arthritis" while all other

systems were negative. (AR 699.) Plaintiff had a BMI of 49.92, was alert and oriented x3, and had a slow gait with enlarged support base. (*Id.*) A left knee exam showed discomfort with deep flexion and a 5/5 strength grade for her hamstring and quads. (*Id.*) After analyzing Plaintiff's knee x-rays from two days prior as well as from April 5, 2015, Dr. Kelly found moderate tricompartmental arthritis with no fracture, mild-moderate arthritis, and explained that the arthritis was a degenerative condition that could not be cured but only alleviated through various means. (*Id.*) Furthermore, she found that Plaintiff was not yet a candidate for orthopedic surgery as she had not exhausted conservative management such as physical therapy, bracing, NSAIDS, conditioning, and weight loss. (AR 700.) Plaintiff's BMI also had to be less than 35 for her to meet with a surgeon. (*Id.*) She was, however, a candidate for a steroid injection in the left knee, which she received that visit. (*Id.*) Plaintiff then received a neoprene knee brace. (AR 701.)

On May 17, 2016, Plaintiff presented to Dr. Garrett for chiropractic treatment relating to a new injury, old injury, and an automobile accident that occurred three days earlier. (AR 678-79.) Plaintiff's pain interfered with her daily routine and in the past six months, Plaintiff experienced decreased range of motion; difficulty walking, bending, and standing lifting; balance problems; headaches; sleep disturbances; and anxiety and stress, although sitting made the complaint better. (AR 679.) She experienced severe neck, wrist, knee, and ankle pain; moderate back, elbow, forearm, and knee pain; and calm hip, upper leg, jaw, foot, face, chest, and stomach pain. (AR 680.) After Plaintiff's accident, she reported going to the hospital by ambulance and receiving splints, x-rays, and medication. (AR 681.)

On May 19, 2016, the Social Security Field Office and Plaintiff completed disability reports; however, the Field Office's report was largely blank. (AR 354-55.) In Plaintiff's report, she listed that none of her medical conditions had changed, but that as of April 7, 2016, diabetes was a new medical condition. (AR 357.) She admitted to being treated for "[p]hysical and [m]ental (including emotional or learning problems)" conditions. (AR 360-61.) Her current medications were Atorvastatin for high cholesterol, Buspirone, Saphris,

and Venlafaxine for depression, Hydroxyzine pamoate for anxiety, Furosemide for decreased swelling, Gabapentin for pain, Metformin for diabetes, Pantoprazole for acid reflux, and Docusate SOD for stool softening. (AR 361, 363.) Plaintiff also noted that since her last report, she had experienced changes to her daily activities, namely "an increasingly difficult time with memory and retaining information" as well as "[a]t times . . . experienc[ing] hallucinations and see[ing] objects that are not actually there." (AR 362.) She had no changes to her work, education, or vocational rehabilitation. (*Id.*)

On May 19, 2016, Plaintiff presented to Family Health Centers with knee pain, normal weight despite a BMI of 50.6, normal gait, and alert and oriented mental status with affect appropriate and good judgment. (AR 1040.) Physician Assistant Little noted that Plaintiff reported bone spurs, received a steroid shot earlier, and should try to lose weight. (*Id.*) Plaintiff was waiting for physical therapy and medications, although the record never indicates her receiving physical therapy. (*Id.*) Plaintiff's problem list included benign hypertension, diabetes, edema, hyperlipidemia, and tobacco use. (AR 1041.)

On May 31, 2016, Plaintiff presented to chiropractor Dr. Garrett with back and neck pain at 7/10, which walking aggravated and which laying down made better. (AR 683.) While pain affected her work, sleep, and activities of daily living, the condition overall was slowly improving, and she felt 20% better from the start of her care. (AR 684.)

On June 9, 2016, Plaintiff presented to Family Health Centers with hyperlipidemia, knee pain, diabetes, tobacco use, obesity with a BMI of 50.9, GERD, and obstructive sleep apnea. (AR 1029.) Physician Assistant Little noted that Plaintiff would have knee surgery soon and needed to see a podiatrist as well; however, the record does not indicate any surgery after this date. (*Id.*) Ms. Little noted that plaintiff was obese with a slow gait and had an alert and oriented mental status. (AR 1030.) Her problem list included benign hypertension, depression, diabetes, plantar fasciitis, and tobacco use. (AR 1031.)

On June 11, 2016, Plaintiff received a cervical spine MRI at Max MRI Imaging, Inc. on referral from Dr. Garrett. (AR 665.) Dr. Yadegar found "moderate generalized loss of articular cartilage of patella with mild lateral subluxation of the patella" as well as

"osteoarthritis on the medial aspect of tibiofemoral joint." (*Id.*) He also noted "marked attenuation of the medial meniscus" which he presumed was "from a prior partial medial meniscectomy, but clinical correlation in this regard is suggested." (AR 666.) He also found "[c]ysts or ganglia along the pes anserinus." (*Id.*)

On June 14, 2016, Plaintiff presented to Family Health Centers for a "well-woman exam" with a BMI of 49.9. (AR 1025.) Her problem list included diabetes, epigastric pain, GERD, depression screening, tobacco use, and need for vaccinations. (AR 1027.)

On June 22, 2016, Plaintiff presented to Dr. Foygelman with a painful left heel. (AR 951.) Plaintiff rated pain at 5/10 and admitted to walking barefoot at home. (*Id.*) The doctor found her "appropriately dressed, articulate, awake, alert, and oriented x 3, appears [her] stated age and appears to be in good health." (*Id.*) He noted that Plaintiff "[could] heel and toe walk with ease as well as arise from a seated position unassisted." (*Id.*) Posterior tibial tendon had a strength grade at 4/5 and ankle joint dorsiflexion was 0 degrees with the knee extended bilateral. (*Id.*) Dr. Foygelman diagnosed Plaintiff with "plantar fasciitis of right foot with associated Heel Spur Syndrome/Infracalcaneal Buristis and Gastrocnemius Equinius contracture." (*Id.*) The doctor suggested custom-made functional orthotic devices to control the biomechanical abnormalities, and other treatment options including wearing higher heeled shoes, refraining from barefoot walking, and using an ice pack and warm soaking feet twice a day. (*Id.*) He also encouraged Plaintiff to use a moisturizing cream twice daily. (AR 952.) On this same day, Plaintiff presented to Family Health Centers for an optometry exam, where she was diagnosed with astigmatism, myopia, and presbyopia. (AR 1023-24.) Her active problem list did not include any noted impairments. (AR 1024.)

On June 27, 2016, Plaintiff received an MRI of the cervical spine, left wrist, and lumbar spine at Max MRI Imaging, Inc. on referral from Dr. Garrett. (AR 663, 667-68.) Dr. Yadegar concluded that Plaintiff had "straightening of normal lordotic curvature, usually secondary to muscular spasm." (AR 664.) On C3-C4, he found "a mild degree of central stenosis . . . secondary to a 2.5mm central posterior disk protrusion causing pressure over the anterior aspect of the thecal sac [while n]eural foramina appear to be normal."

(*Id.*) On C4-C5, he found "a mild degree of central stenosis . . . secondary to a broad-based asymmetric posterior disk/endplate osteophyte complex, which at its maximum on the left side measured about 3.5mm and is causing pressure over the anterior aspect of the thecal sac [as well as] marked narrowing of the left neural foramen." (*Id.*) On C5-C6 he found "a mild degree of central stenosis . . . secondary to a 3.5mm left paracentral posterior disk protrusion causing pressure over the anterior aspect of the thecal sac [as well as] marked narrowing of the left neural foramen [while the r]ight neural foramen appears to be normal." (*Id.*) On C6-C7 he found "a mild degree of central stenosis . . . secondary to a broad-based asymmetric posterior disk protrusion, which at its maximum on the left side measures about 3mm and is causing pressure over the anterior aspect of the thecal sac [as well as] moderate narrowing of the right neural foramen and moderately significant narrowing of the left neural foramen." (*Id.*)

In her left wrist, Dr. Yadegar found "[s]ubchondral erosions of navicular and hamate" as well as "[v]ery early osteoarthritic changes at carpal first metacarpal joint." (*Id.*) Regarding her lumbar spine, at L3-L4 level, Dr. Yadegar found "disk desiccation . . . with a 1.5mm broad-based posterior disk/end plate osteophyte complex indenting the anterior aspect of the thecal sac." (AR 669.) At L4-L5 level he found "disk desiccation" as well as "a 2mm broad-based posterior disk/end plate osteophyte complex making contact with the anterior aspect of the thecal sac." (*Id.*) At the L5-S1 level, he found "disk desiccation" as well as "mild hypertrophic changes at facet joints on the right side." (*Id.*)

On July 8, 2016, Plaintiff presented to chiropractor Dr. Garrett with back and knee pain at 5/10 and present 26%-50% of the time. (AR 725.) Her pain worsened when walking too long or standing, and it improved when lying down or sitting. (*Id.*) Plaintiff marked that it moderately interfered with work, sleep, and activities of daily living, while overall her condition was better than during her previous visit. (*Id.*)

On July 22, 2016, Plaintiff had blood work done at Downtown Connections Family Health Center, showing mostly normal readings with some abnormalities, such as high cholesterol. (AR 496-502.)

19-CV-604-JM(WVG)

On August 1, 2016, Dr. Korsh administered a platelet-rich plasma ("PRP") injection into Plaintiff's left knee joint space at San Diego Spine Center. (AR 751.) Plaintiff "tolerated the procedure well [and] did not display or report any signs of increased pain, shortness of breath, or other discomfort." (*Id.*) During this appointment, Dr. Korsh noted normal reflexes, a normal sensory examination, 5/5 strength for a motor examination, and a normal gait, heel-walk, toe-walk, and heel-to-toe-walk. (AR 753-54.) He also wrote that Plaintiff "is physically deconditioned[,] has left knee tenderness with no gross instability[,] has crepitus with range of motion[, and] has cervical lumbar tenderness." (AR 754.) His impressions were cervical strain with disc herniations on three discs, lumbar strain with disc herniations on two discs, left knee contusion with internal derangement, and left wrist strain with underlying degenerative changes. (AR 755-56.) Plaintiff stated that she wanted to avoid surgery, and Dr. Korsh noted that she would likely need to undergo a series of three knee injections. (AR 756.)

On August 2, 2016, Plaintiff presented to Family Health Centers with swollen legs, edema, shortness of breath, and a BMI of 52.4. (AR 1018.) She was alert and oriented x3, and her problem list included depression, diabetes, edema, anemia, knee joint effusion, pain in lumbar spine, plantar fasciitis, PTSD, and tobacco use. (AR 1019-20.)

On August 4, 2016, Plaintiff presented to Family Health Centers with knee pain, swelling, instability, impaired mobility, pain with walking up/down steps, and a BMI of 52.6. (AR 1014.) Plaintiff's knee exam revealed a gait without limp or use of cane/walker, no warmth or redness, and pain or tenderness with palpation of joint. (AR 1015.) Ms. Little told Plaintiff to rest, ice, heat, compress, and elevate the knee and to avoid activities that worsened pain or aggravated the condition. (*Id.*) Plaintiff's problem list included diabetes, knee pain, and tobacco use. (AR 1016.)

On August 10, 2016, Plaintiff presented to Dr. Foygelman with a painful left heel that had been present for months. (AR 953.) He noted that Plaintiff had "been following all instructions and feels a little bit better." (*Id.*) Plaintiff was once again "appropriately dressed, articulate, awake, alert, and oriented x3, appears their stated age and appears to be

in good health." (*Id.*) Her posterior tibial tendon still had a strength graded at 4/5 and her ankle joint dorsiflexion was zero degrees with the knee extended bilateral. (*Id.*) The doctor dispensed a night splint and advised custom made functional orthotic devices to control the abnormal biomechanics of the feet, to help rebalance intrinsic and extrinsic musculature, and to place the foot in a more normal functioning position in gait. (*Id.*) Accordingly, he performed neutral suspension casting for these devices. (*Id.*) Plaintiff's subjective foot pain was 5/10 and present mostly at rest after walking. (*Id.*)

The next day, Plaintiff arrived at Scripps Mercy Hospital with a chief complaint of shortness of breath. (AR 919.) Plaintiff stated that she had to sleep sitting up and had chronic peripheral edema, although she denied GERD, period of inactivity, and back or leg pain. (*Id.*) Providers recorded that Plaintiff smoked tobacco, was well-nourished, and was in no acute distress. (AR 920.) The Emergency Department found no acute abnormalities, a completely benign physical exam, and a trace of edema in her lower extremities. (AR 921.) It also found that Plaintiff had no evidence of diabetes and slept for most of the emergency room stay. (AR 922.) In an addendum, the provider noted how Plaintiff thought her shortness of breath may have been due to her body habitus and obesity. (AR 923.) Additionally, Plaintiff was aware, alert and oriented, and had 5/5 strength throughout. (*Id.*)

On this same day, Plaintiff also presented to Family Health Centers with severe morbid obesity, a BMI of 52.7, shortness of breath with minimal exertion, and a request for a cardiology referral. (AR 1011.) Dr. Santoyo noted under Plaintiff's assessment/plan, "STOP EATING SALTY FOODS / FATTY FOODS[,] CARDIO REFERRAL[,] MONITOR WEIGHT." (AR 1012 (emphasis in original).) Her problems list included diabetes, edema, and tobacco use. (*Id.*)

On August 16, 2016, Plaintiff presented to Family Health Centers with obstructive sleep apnea, shortness of breath, waking up with anxiety attacks, a hernia, obesity, a BMI of 52.4, a slow gait, and an alert and oriented mental status. (AR 1008-09.) Physician Assistant Little also noted that Plaintiff's edema improved significantly with compression

stockings. (AR 1008.) Plaintiff's problem list included diabetes, lumbar spondylosis, obstructive sleep apnea, and tobacco use. (AR 1009.)

On August 23, 2016, Plaintiff presented to Family Health Centers with cold symptoms and a BMI of 52.9. (AR 1005.) She received Robitussin, Tylenol, and Claritin, and her problem list included diabetes, otitis media, tobacco use, and upper respiratory infection. (AR 1005-06.)

On August 25, 2016, Plaintiff presented to Family Health Centers with ear pain in both ears and a BMI of 51.7. (AR 1001.) Her problem list included diabetes, otitis media, tobacco use, and upper respiratory infection. (AR 1003.)

On August 26, 2016, Plaintiff presented to chiropractor Dr. Garrett with a pain level of 4/10 present 1%-25% of the time. (AR 749.) Walking made the pain worse while lying down improved it. (*Id.*) Plaintiff said that it severely limited her ability to work and conduct normal activities of daily living, while it moderately affected her sleep; however, the condition nonetheless was improving. (AR 750.)

On August 29, 2016, Plaintiff presented to Dr. Korsh for a follow-up appointment on her left knee injection. (AR 757.) Plaintiff noted that her pain improved after the injection, rating it at 3/10, and stating "[t]hat worked great, I need another." (*Id.*) Dr. Korsh also noted that medications and a polar care unit helped as well. (*Id.*) Once again, Dr. Korsh noted normal reflexes, a normal sensory examination, 5/5 strength for a motor examination, and a normal gait, heel-walk, toe-walk, and heel-to-toe-walk. (AR 757-58.) He also wrote that Plaintiff "is physically deconditioned[,] has left knee tenderness[, has] no gross instability but she has crepitus with range of motion[, and s]he has posterior cervical and lumbar tenderness with decreased ROM [range of motion]." (AR 758.) Dr. Korsh advised another PRP injection in two weeks as well as further chiropractic management. (*Id.*)

On September 8, 2016, Plaintiff presented to Family Health Centers with otalgia, no body ache, no shortness of breath, normal weight (despite a BMI of 52.4), and a normal gait. (AR 998.) Her problem list included diabetes, otalgia, tobacco use, and upper respiratory infection. (AR 999.)

19-CV-604-JM(WVG)

On September 12, 2016, Plaintiff received another PRP injection to her left knee from Dr. Korsh. (AR 752.) Again, Plaintiff "tolerated the procedure well [and] did not display or report any signs of increased pain, shortness of breath, or other discomfort." (*Id.*) Once again, Dr. Korsh noted normal reflexes, a normal sensory examination, 5/5 strength for a motor examination, and a normal gait, heel-walk, toe-walk, and heel-to-toe-walk. (AR 759-60.) He also wrote that Plaintiff "is physically deconditioned[,] has left knee tenderness[, has] no gross instability but she has crepitus with range of motion[, and s]he has posterior cervical and lumbar tenderness with decreased ROM [range of motion]." (AR 760.) Dr. Korsh noted a follow up appointment in October for further evaluation, however, this appointment either did not occur or is not present in the record. (*Id.*)

On September 15, 2016, Plaintiff presented to Dr. Foygelman with a painful left heal that had been present for a month. (AR 954.) He noted that Plaintiff had "been following all instructions and feels a little bit better." (*Id.*) Plaintiff was once again "appropriately dressed, articulate, awake, alert, and oriented x3, appears their stated age and appears to be in good health." (*Id.*) Her posterior tibial tendon still had a strength graded at 4/5 and her ankle joint dorsiflexion was zero degrees with the knee extended bilateral. (*Id.*) Plaintiff's subjective foot pain was at 5/10 and present mostly at rest after walking, and Plaintiff exhibited no anxiety or depression. (*Id.*)

On September 20, 2016, Plaintiff presented to Family Health Centers with otalgia, although she reported to feel "much better." (AR 993.) Plaintiff was also obese with a BMI of 52.9, a normal gait, and an alert and oriented x4 mental status. (*Id.*) Her active problem list included diabetes, obstructive sleep apnea, and tobacco use. (AR 994.)

On October 7, 2016, Plaintiff presented to Dr. Foygelman with a painful left heel that had been present for months. (AR 955.) He noted that Plaintiff had "been following all instructions and feels a little bit better." (*Id.*) Plaintiff was once again "appropriately dressed, articulate, awake, alert, and oriented x 3, appear[ed] their stated age and appear[ed] to be in good health." (*Id.*) Like during her first appointment with him, Plaintiff's posterior tibial tendon still had a strength graded at 4/5 and her ankle joint

dorsiflexion was zero degrees with the knee extended bilateral. (*Id.*) Plaintiff's subjective foot pain was 5/10 and present mostly at rest after walking, and Plaintiff exhibited no anxiety or depression. (*Id.*) This visit, Dr. Foygelman dispensed and fitted Plaintiff's orthotic devices into her shoes. (*Id.*) He noted that the "devices were comfortable and controlling well up on gait analysis." (*Id.*) Plaintiff could "ambulate without distress with use of the custom made orthotic devices with shoes." (*Id.*) Dr. Foygelman instructed Plaintiff to not walk barefoot at home and that he would see Plaintiff on a regular basis for checkup and foot care; however, this was the last time in the record that Plaintiff visited this doctor. (AR 956.)

On October 21, 2016, Plaintiff presented to Family Health Centers with no specific issue; however, her problem list included diabetes, generalized anxiety disorder, and tobacco use. (AR 992.)

On October 27, 2016, Plaintiff presented to Family Health Centers with earaches, no shortness of breath, alert and oriented, and a BMI of 52.7. (AR 988.) Her problem list included diabetes, otalgia, otitis media, tobacco use, and upper respiratory infection. (AR 989.)

On November 29, 2016, Plaintiff presented to Family Health Centers with PTSD, generalized anxiety disorder, bipolar disorder, denial of suicidal ideation, no shortness of breath, no body aches, and a BMI of 53.9. (AR 984.) Physician Assistant Little stated that Plaintiff would not see her psychiatrist for a few more weeks. (*Id.*) Plaintiff was obese with a slow gait and a mental status that was alert and oriented with sad affect and denial of suicidal or homicidal ideations. (AR 985.) Her problem list included bipolar disorder, depression, diabetes, edema, knee joint effusion, otalgia, tobacco use, and upper respiratory infection. (AR 986.)

On December 29, 2016, Plaintiff presented to Family Health Centers with shortness of breath, a foot callus, tobacco use, obesity, a BMI of 53.8, obstructive sleep apnea, and an alert and oriented mental status. (AR 979-80.) Her problem list included depression, diabetes, a foot callus, iron deficiency anemia, knee pain, obstructive sleep apnea, pain in

lumbar spine, PTSD, shortness of breath, tobacco use, and an upper respiratory infection. (AR 981.)

On January 6, 2017, Plaintiff presented to Dr. Szkopiec at Chula Vista Heart Clinic as referred by Physician Assistant Little with the chief complaints of sharp chest pains transient unrelated to effort in the mid sternal area, history of diabetes, suspected history of sleep apnea, history of knee pain with activity, and history of fatty liver. (AR 603, 766.) Her BMI was 53.58, she could take care of herself, she admitted to smoking half a pack of cigarettes per day, and she stated that she was disabled and not employed. (*Id.*) Dr. Szkopiec found chest pain atypical, morbid obesity, major emotional disorder per history, obstructive sleep apnea, and non-insulin-independent diabetes mellitus ("NIIDM"), while ruling out angina pectoris, thyroid disease, and hyperlipidemia. (AR 604, 767.) Her plan included quitting smoking, weight loss, a 2D echo Doppler, a modified stress test, and a diet with no added salt and calorie restriction. (*Id.*)

On January 17, 2017, Plaintiff presented to Family Health Centers with tobacco use, shortness of breath, a BMI of 53.7, a normal gait, and a mental status that was alert and oriented x4 with affect appropriate. (AR 976.) Her problem list included diabetes, respiratory disease, shortness of breath, and tobacco use. (AR 977.)

On January 19, 2017, Plaintiff presented to Family Health Centers with knee pain, lumbar spondylosis, shortness of breath, obesity with a BMI of 54.4, and an antalgic gait with a left knee brace and compression hose bilat. (AR 972.) She had chronic pain at 7/10 and Physician Assistant Little stated that "walking is becoming difficult with the left knee OA. SHe [*sic*] cannot have surgery due to her obesity. SHe [*sic*] is wearing brace and compression hose." (*Id.*) Despite this, her knee strength was 4.5/5 and her mental status was alert and oriented x4. (AR 972-73.) Her record noted left knee arthroscopic surgery and bone spurs from 2009. (AR 973.) Her problem list included chronic pain, diabetes, lumbar spondylosis, respiratory disease, shortness of breath, and tobacco use. (AR 974.)

On January 24, 2017, Plaintiff arrived at Scripps Mercy Hospital as a walk-in triage patient on referral from Ms. Little. (AR 924.) Her chief complaint was chest pain rating

7/10 as well as shortness of breath, which she believed was from her hiatal hernia on which she eventually had surgery. (AR 925.) The provider described Plaintiff as "[w]ell-developed, well-nourished, alert, overweight, African American female, in no acute respiratory distress," alert and oriented, and having extremity strength at 5/5. (AR 926.) During the visit, Plaintiff's chest pain reduced from 8/10 to 2/10. (AR 928-29.)

On February 1, 2017, Plaintiff underwent a stress test conducted by Dr. Szkopiec. (AR 768.) According to the report, "[t]he test was initiated at stage I of the Bruce protocol with speed velocity of 1.9 miles per hour, but had to be decreased to 1.5 with an elevation of 5% due to the patient's inability to keep up with the 1st stage of the Bruce protocol." (*Id.*) In total, Plaintiff "walked for 2 minutes and 20 seconds at this speed developing leg fatigue and dyspnea," leading to observations of "[p]oor exercise tolerance" and "[s]uspected transient hypoxia related to poor signal from the oximeter." (*Id.*) In an addendum, the doctor added that "[t]he stress test had to be stopped because of weakness of the legs and dyspnea." (*Id.*)

On February 2, 2017, Plaintiff presented to Family Health Centers with obstructive sleep apnea, respiratory disease, normal gait, normal weight,[6] and an alert and oriented x4 mental status. (AR 967.) Her problem list included depression, diabetes, knee joint effusion, lumbar spondylosis, obstructive sleep apnea, respiratory disease, tobacco use, and upper respiratory infection. (AR 969.)

On February 9, 2017, Plaintiff presented to Family Health Centers with obstructive sleep apnea, shortness of breath, no body-aches, and a BMI of 54.4. (AR 963.) Physician Assistant Little noted that results from a sleep test were still unavailable. (*Id.*) Plaintiff was alert and oriented x4, and her problem list included bipolar disorder, diabetes, obstructive sleep apnea, respiratory disease, and tobacco use. (AR 963-64.)

---

[6] This is likely a misprint as one-week later Plaintiff presented with a BMI of 54.4. (AR 963.)

1    On February 12, 2017, a certified earnings record noted Plaintiff's yearly salary
2    since 1977. (AR 254-57.) Within the last 15 years of Plaintiff's alleged disability onset, her
3    salary fluctuated between approximately $0 and $31,000, with no income in 2016 and
4    2017. (AR 256.) A detailed earnings report from this same day listed her past work, with
5    jobs completed in the past 15 years from her alleged disability onset including work at
6    Lefleur Transportation of Texas Inc, Matagorda County Hospital District, Visiting Nurse
7    Association of Houston, Inc., Mariner Health Care Management, Nurses Home Services
8    Inc., Girling Health Care Inc., Bae Systems Employee Services Inc, Zachary Industrial,
9    Inc., BAE Systems Tactical Vehicle, Walgreen Co, Matt J. Ottis Jr, United Shutdown
10   Safety Texas Inc, The Heller Group Inc, Rosalie Julia Bacica Estate, and Pollo Operations
11   Inc. (AR 260-64.) More detailed reports were produced on October 27, 2017, relaying the
12   same pertinent information (AR 266-82); however, these reports noted possible gaps in
13   2000, duplicates in 2002, and incompletes in 2003, 2007, 2010, and 2015 (AR 281).

14   On February 14, 2017, Plaintiff presented to Family Health Centers with respiratory
15   disease and a BMI of 53.2. (AR 960.) Physician Assistant Little found COPD and
16   obstructive sleep apnea, for which she told Plaintiff to follow up on her sleep studies that
17   she ordered. (AR 960-61.) Plaintiff's problem list included diabetes, obstructive sleep
18   apnea, respiratory disease, and tobacco use. (AR 961.)

19   On February 17, 2017, Plaintiff presented to Scripps Mercy Hospital ER with the
20   chief complaint of shortness of breath that had woken her up at night and recently prevented
21   her from falling back asleep. (AR 930.) The provider noted that Plaintiff smoked cigarettes,
22   appeared alert and oriented in no acute distress, and had a grossly non-focal motor and
23   sensory exam. (AR 931.) Plaintiff received a diagnosis of obstructive sleep apnea likely
24   caused by nighttime dyspnea and the recommendation to follow up on a sleep study to then
25   begin with a BiPAP machine. (AR 932.)

26   On February 24, 2017, Family Health Centers provided service to Plaintiff; however,
27   the record states "[s]ee outreach notes," none of which appear in the record. (AR 1105.)
28   Plaintiff's problem list included diabetes and tobacco use. (AR 1105-06.)

1          On March 13, 2017, Plaintiff presented to Scripps Mercy Hospital with the primary
2    complaint of an abscess. (AR 933.) The provider noted that Plaintiff used tobacco, was not
3    in acute distress, moved all extremities, and had intact cognition. (AR 934.) A bedside
4    ultrasound revealed a 0.7 x 2 cm abscess pocket just above the mons pubis that doctors
5    incised and drained. (*Id.*) Plaintiff received anesthesia with lidocaine and was discharged
6    after doctors dressed the incision. (AR 934-35.)

7          On March 14, 2017, Plaintiff presented to Family Health Centers with upper
8    respiratory infection, obstructive sleep apnea, respiratory disease/COPD, and edema. (AR
9    1100.) Physician Assistant Little found Plaintiff to be obese with a normal gait and BMI
10   of 55.7. (*Id.*) Her problem list included chronic pain, diabetes, edema, knee pain, lumbar
11   spondylosis, obstructive sleep apnea, pain in lumbar spine, respiration disease/COPD,
12   tobacco use and upper respiratory infection. (AR 1102.)

13         On March 23, 2017, Plaintiff received an echocardiogram at the Chula Vista Heart
14   Clinic. (AR 605.) Dr. Szkopiec found normal left ventricular size and systolic function,
15   mild to moderate left ventricular hypertrophy, mild left atrial enlargement, preserved right
16   heart, no pulmonary hypertension, and no gross valvular abnormalities. (*Id.*)

17         On March 24, 2017, Plaintiff presented to Chula Vista Heart Clinic with no chest
18   pains, an occasional sharp left precordial pain, and a BMI of 55.25. (AR 601.) Dr. Szkopiec
19   found Plaintiff positive for orthopnea, fatigue, dyspnea, edema, and dizziness. (*Id.*)
20   Furthermore, he stated that Plaintiff had stopped smoking and that her chest pains were
21   atypical. (AR 602.) She also had morbid obesity, obstructive sleep apnea, diabetes, and
22   was ruled out of having hyperlipidemia and thyroid disease. (*Id.*)

23         On April 6, 2017, Plaintiff presented to Family Health Centers with ear pain and a
24   BMI of 65.4, although this was likely calculated in error as her listed weight was 393
25   pounds while her weight three weeks later was 336 pounds. (AR 1089, 1096.) Plaintiff's
26   problem list included diabetes, otitis media, and tobacco use. (AR 1098.)

27         On April 27, 2017, Plaintiff presented to Family Health Centers with
28   temporomandibular joint disorder, hyperlipidemia, diabetes, obesity with a BMI of 55.9,

obstructive sleep apnea, edema, and respiratory disease/COPD. (AR 1089.) Plaintiff had no body aches or shortness of breath, was obese with normal gait, and had an alert and oriented mental status x4. (AR 1089-90.) Little also refilled Plaintiff's Norco, stating that Plaintiff is "leaving for 2 months so #60 given for severe knee pain." (AR 1090-91.) Plaintiff's problem list included chronic pain, depression, diabetes, edema, high cholesterol, knee joint effusion, lumbar spondylosis, obstructive sleep apnea, PTSD, respiratory disease/COPD, metabolic disorder screening, shortness of breath, temporomandibular joint disorder, tobacco use, and upper respiratory infection. (AR 1092.)

On May 16, 2017, Dr. Sandra Lim at Family Health Centers completed a medical source statement by filling out a psychiatric review form. (AR 581.) At that point, she had seen Plaintiff since February 2017 for Major Depressive Disorder, Recurrent, Moderate. (*Id.*) Plaintiff was euthymic, in daily compliance with her psychological medications, and still experiencing some anxiety due to her uncertain housing situation. (*Id.*) Plaintiff responded well to her medications, had a fair prognosis, and her impairment was not expected to last 12 months. (*Id.*) Dr. Lim also noted no neurocognitive disorders, Autism spectrum disorders, or neurodevelopmental disorders; however, she could not conclude whether Plaintiff's disorder began prior to age 22 due to having started treating her relatively recently. (AR 582.) Dr. Lim found that Plaintiff's symptoms were either "none/mild" for functional limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (AR 582-83.) She stated that Plaintiff could miss work about once a month due to her anxiety symptoms, which were minimal at that time; however, she did not anticipate that Plaintiff would be off-task in the workplace due to mental health symptoms or face mental health impairments not amenable to treatment. (AR 583-84.) Lastly, she stated that Plaintiff did not have a medically documented history of serious and persistent neurocognitive, psychotic, or affective disorders lasting at least two years with medical treatment—while she noted mild treatment for depression on October 7, 2015 at Family Health Centers, it had not been two years since then. (AR 584.)

On May 18, 2017, Plaintiff presented to Family Health Centers with depression, hyperlipidemia, and obesity with a BMI of 56.4. (AR 1085.) Physician Assistant Little stated that Plaintiff "continues to gain weight and her depression is not improving. She is seeing Dr. Lim and the therapist Ruth and this is keeping her level and denies [suicidal or homicidal ideation]." (*Id.*) Furthermore, Plaintiff said that she did not walk due to shortness of breath, a pulmonary function test showed restriction, and she did not use inhalers prior to walking. (*Id.*) Ms. Little found Plaintiff obese with slow gait and a mental status that was alert and oriented x4 with affect flat. (*Id.*) Plaintiff did "not seem very motivated to change her lifestyle or situation" and her problem list included depression, diabetes, obesity, and tobacco use. (AR 1087.)

On May 24, 2017, Plaintiff presented to Family Health Centers with depression, bipolar disorder, tobacco use, chronic pain, and obesity with a BMI of 56.8. (AR 1072.) Plaintiff reported painful calluses on her left foot and left heal pain that felt like "cracking." (*Id.*) Her problem list included corns and callus, diabetes, tinea pedis, and tobacco use. (AR 1073.)

On July 6, 2017, Plaintiff presented to Family Health Centers with hyperlipidemia, diabetes, chronic pain, obesity with a BMI of 55.2, GERD, edema, and respiratory disease/COPD. (AR 1033.) Physician Assistant Little noted that Plaintiff's knee pain remained at 7/10 but stated that "Norco helps this pain so that she can do her ADLs [activities of daily living]." (*Id.*) As an addendum twelve days later, Ms. Little noted "PT for knee," although the record does not indicate that Plaintiff attended physical therapy. (AR 1036.) Additionally, Ms. Little noted that Plaintiff was obese, sitting comfortably, had an alert and oriented mental status x4, and while she needed to change her lifestyle, she was seeing a mental health professional and remained stable. (AR 1034.) Plaintiff's problem list included chronic pain, depression, diabetes, edema, knee joint effusion, knee pain, lumbar spondylosis, pain in lumbar spine, PTSD, respiratory disease/COPD, shortness of breath, tobacco use, and upper respiratory infection. (AR 1036-37.) Little

requested that Plaintiff follow up in two months for a routine exam; however, the record does not include this appointment. (AR 1038.)

On July 13, 2017, Plaintiff presented to Family Health Centers with unspecified astigmatism and no other issue. (AR 996.)

On July 27, 2017, Plaintiff presented to Family Health Centers with neck pain and a BMI of 55.9. (AR 957.) Her neck was supple, her shoulder had no deformity but showed significant weight and tension of the trapezius bilat, and her mental state was alert and oriented x4 with affect appropriate. (*Id.*) Physician Assistant Little wrote that Plaintiff "[m]ust loose [*sic*] weight and live healthy lifestyle," and found her to be diabetic, have neck pain, and be a tobacco user. (AR 958.)

**C.    The Administrative Law Judge's Hearing and Decision**

On October 31, 2017, Plaintiff submitted a Pre-Hearing Memorandum before the Administrative Law Judge ("ALJ"). (AR 378-83.) Under step three, Plaintiff contended that she met criteria of listings 12.04, 12.06, and 12.15 for mental disorders due to her depression, bipolar disorder, anxiety, PTSD, and subsequent inability to interact with others or withstand the stress and pressures of an eight-hour workday. (AR 378-81.) At step four, Plaintiff contended that she could not perform her past work as a phone receptionist, photo tech, and nurse assistant, due to her mental issues as well as physical ailments under listing 1.04, which Plaintiff did not discuss under step three. (AR 381.) At step five, Plaintiff contended that her back, neck, wrist, knee, leg, and hand pain limited her to light work and that these limitations met a Medical Vocational Guidelines ruling of disabled. (AR 381-83.) Specially, Plaintiff discussed her "moderate generalized loss of articular cartilage of patella with mild subluxation of the patella" as well as "joint space narrowing and osteophytes" present in the knee. (AR 382.)

On November 8, 2017, the ALJ held a hearing with Plaintiff, her attorney, and a vocational expert present. (AR 56.) Plaintiff testified that she was fifty-five years old and completed twelfth grade and some college, although did not receive a college degree. (AR 58-59.) Between 2004 and 2007, she worked as a CNA, stating that now she could not lift

more than 10 pounds but as a CNA she needed to "lift the patient, roll them over, lift them from wheelchairs, and position the position [*sic*]." (AR 59.) Between 2008 and 2009, Plaintiff worked for BAE Systems where she assembled truck parts for the army, specifically fire extinguishers, windshields, and small parts. (AR 59-60.) Plaintiff admitted to having to lift "[p]robably ten, 20" pounds, but then stating that she needed to lift "[n]ot even that" but only a fire extinguisher. (AR 60.) The ALJ referred to Plaintiff living and taking care of residents at Connections, although Plaintiff did not remember this place. (*Id.*) Plaintiff also stated her height at 5'5" and her weight at 315 pounds. (*Id.*) She testified that neck pain stiffened her to the point where she could not move her neck at times, and that she also had pain present in her sciatic nerve, feet, and spine. (AR 61.) In her left knee, she stated that she had "bone to bone, no cartilage" and that she experienced pain when walking or sitting for too long. (*Id.*) She admitted to having no more pain in her wrists or hands although pain was still extant in her left foot due to a bone spur. (AR 61-62.) She stated that this caused chronic pain and that "[i]t feels like my whole foot is splitting when I walk." (AR 62.) Plaintiff's emphysema and COPD also made it difficult for her to breathe when she walked and sometimes talked. (*Id.*) Plaintiff admitted to smoking at most four cigarettes a day and that she went through a pulmonary function study. (AR 62.) Lastly, she noted her hiatal hernia and back problems made lifting difficult. (AR 63.)

Plaintiff then stated that she suffered from depression, which made adjusting to changes in her body difficult as she could not do things that she enjoyed in the past. (*Id.*) She stated: "I have to sit if I'm trying . . . to cook or anything. I have to sit to do it. I get tired faster. I can't breathe. It makes me tired. I have no energy. Sometimes I don't want to get out of bed." (*Id.*)

Plaintiff's attorney then had an opportunity to question her, with Plaintiff testifying that she had bipolar disorder that made her anxious, scratch her skin, and get agitated. (AR 63-64.) She stated that she took Albuterol for it, although later rescinded this and forgot the name of her medication. (AR 64.) Plaintiff also testified to seeing things that were not there due to a personality disorder. (*Id.*) She also described her difficulties dressing due to

being obese and having pain: she could no longer take baths, could only take showers, and preferred using handicapped restrooms due to difficulty getting up from low toilets without use of rails to hold on to. (*Id.*) Furthermore, she tired from cooking, needed to sit and rest before going to the stove, could stand for 15 minutes before needing to rest, and could sit for 30 minutes before getting "stiff and in pain to where I can't move." (AR 65.) Plaintiff could walk about half a block to a block before getting too out of breath. (*Id.*) At home, Plaintiff laid down as it was most comfortable for her back, knee, and legs that swelled due to edema. (*Id.*) Plaintiff also had anxiety attacks sometimes when it rained, which prevented her from breathing. (AR 65-66.) Plaintiff then admitted to being homeless and in transition to find a place outside of her shelter. (AR 66.)

The ALJ then asked Plaintiff about her psychologist Dr. Lim, who Plaintiff testified to seeing her once or twice a month. (AR 66.) She stated that Dr. Lim was not the person most knowledgeable about her current condition as she was fairly new and her other doctor left. (*Id.*)

The ALJ then questioned the vocational expert (VE) about Plaintiff's past professions. (AR 67.) The VE described these jobs: CNA was medium exertion general skill, home health aide was medium exertion semi-skilled, photo technician was light exertion semi-skilled, and phone receptionist was sedentary and semi-skilled. (AR 67-68.) At the ALJ's request, the VE then described Plaintiff's assembly work at BAE Systems Tactical Vehicle as DOT code 706.684-022, which was light and unskilled. (AR 68.) The ALJ then proposed the following hypothetical:

> [A]ge 52. Has the alleged onset date with 12 years of education, the same past work at SGA, which includes some of those jobs that you gave us. It's opined this hypothetical claimant can lift and carry up to 20 pounds occasionally, ten pounds frequently, can stand or walk for six hours out of eight, sit for six, can occasionally climb stairs and ramps, never ropes, ladders and scaffolds . . . can occasionally stoop, kneel, crouch and crawl. Reaching overhead is limited to frequently bilaterally and this hypothetical claimant should avoid concentrated exposure to fumes, odors, dusts and gases, unprotected heights and moving and dangerous machinery. In addition this hypothetical claimant is able to understand, remember and carry out simple instructions and tasks,

19-CV-604-JM(WVG)

1
2

should not work in a setting which includes constant or regular contact with the general public and should not perform work which includes more than infrequent handling of customer complaints.

3
4
5

(AR 68-69.) During this hypothetical, Plaintiff interrupted saying "[n]o stairs," but the ALJ replied, "Ma'am, this isn't your turn to talk. Thank you." (AR 68.)

6
7
8
9
10
11
12
13

Under these parameters, the VE testified that this hypothetical plaintiff could only return to past work as an assembly line worker. (AR 69.) The ALJ then asked if the VE's "testimony [had] been consistent in the DOT with respect to characteristics of occupations" to which the VE replied yes. (*Id.*) Plaintiff's attorney then asked the VE whether such hypothetical claimant who would be "20 percent off task or absent three times a month due to pain or mental impairment" would be able to work. (*Id.*) The VE replied that this "would be too excessive for employment in the competitive labor market, for the majority of employers." (*Id.*)

14
15
16
17
18

Before closing the record, the ALJ gave Plaintiff the opportunity to say anything else because he cut her off during the hypothetical. (AR 69-70.) Plaintiff restated that she cannot do stairs and that "stooping and bending is a problem . . . with pain also." (AR 70.) She lastly testified that the assembly work required a lot of standing and there "[a]in't no way I'd be able to do that." (*Id.*)

19
20
21
22
23
24
25
26
27
28

On March 21, 2018, the ALJ issued an unfavorable opinion denying Plaintiff benefits. (AR 31.) In this decision, he found that Plaintiff met the insured status requirements of the SSA and did not engage in substantial gainful activity since March 25, 2015, the alleged onset date. (AR 36.) He then found that Plaintiff's severe impairments were the following: "degenerative changes of the cervical spine, lumbar spine and left knee; obesity; tobacco-related breathing difficulties and depressive disorder." (*Id.*) He also noted that Plaintiff's non-severe conditions were the following: "anemia, hyperlipidemia, gastroesophageal reflux disease (GERD), hiatal hernia, plantar fasciitis, mild degenerative changes of the left wrist and diabetes mellitus." (AR 37.) Regarding Plaintiff's foot pain, the ALJ wrote the following:

19-CV-604-JM(WVG)

1
2
3
4
5
6
7
8
9

> [The Plaintiff] was referred for an ankle/foot evaluation. However, the record reveals a gap in treatment for this condition until October 2017, when she presented to a physician complaining of a painful left heel that had been present for days/months; she was treated conservatively, with her being prescribed a moisturizing cream (Exhibit 22F). Physical examination did reveal pain on palpation of the affected area, decreased range of motion and 4/5 strength, and the claimant was diagnosed with plantar fasciitis and given a night splint, but thereafter reported symptomatic improvement with treatment compliance (Exhibits 23F-25F). The undersigned finds insufficient evidence to establish that this condition has imposed more than minimal work-related limitations for a period of 12 months (or is expected to do so or result in death). Accordingly, the undersigned finds that this condition does not meet the durational requirement of severe impairment.

10
11

(AR 37-38.) The ALJ then found that Plaintiff did not meet requirements for listings 1.02, 1.04, 3.00 *et seq.* and 12.04. (AR 38.) For listing 1.02, the ALJ stated the following:

12
13
14
15
16
17
18
19
20
21
22
23
24

> The claimant's knee impairment does not meet listing-level severity under §1.02 because there is no evidence of gross anatomical deformity of the hip, knees, shoulders, elbows or wrists and no medically acceptable imaging showing joint space narrowing, bony destruction or ankylosis of the affected joints resulting in inability to ambulate effectively or inability to ambulate or to perform fine and gross movements effectively. The applicable regulations provide that, to ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. The regulations provide the following, non-exclusive examples of ineffective ambulation: the inability to walk without the use of a walker, two crutches or two canes; the inability to walk a block at a reasonable pace on rough or uneven surfaces; the inability to use standard public transportation; the inability to carry out routine ambulatory activities, such as shopping and banking; and the inability to climb a few steps at a reasonable pace with the use of a single hand rail (20 CFR Part 404, Subpart P, Appendix 1 § 1.00B2b(2)). In this case, physical examinations do not reveal a need for assistive devices as contemplated above, nor any other evidence of gait/ambulation deficits.

25

(AR 38.)

26
27
28

Furthermore, the ALJ found that Plaintiff's degenerative disc disease did not meet or medically equal the criteria of section 1.04, her breathing disorders received minimal treatment "with no evidence of exacerbations/complications or laboratory findings as

required under any pertinent listings," and her depression did not meet or medically equal the criteria of listing 12.04. (AR 39.) In understanding, remembering, or applying information, the ALJ found that the claimant had mild limitations. (*Id.*) Despite alleging difficulty completing tasks and taking medications without reminders, the ALJ stated the following:

> [Plaintiff could still] perform simple maintenance, prepare meals, pay bills, take public transportation, shop, following some instructions and drive. In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, following instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, and there is no mention of any significant or persistent issues with the claimant's short- or long-term memory.

(*Id.*)

In interacting with others, the ALJ found that claimant had moderate limitations because she could "get along with others, shop, spend time and friends and family, and take public transportation" despite claiming to difficulty engaging with others. (*Id.*) In addition, the ALJ noted that "the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, and appeared comfortable during most appointments." (*Id.*)

In concentrating, persisting, and maintaining pace, the ALJ found that Plaintiff had moderate limitations because Plaintiff "said that she is also able to drive, prepare meals, manage funds, follow some instructions and handle her own medical care" despite contending that she required breaks from concentrating on tasks for longer than ten to thirty minutes. (*Id.*) The ALJ also noted that "the record fails to show any mention of significant distractibility or an inability to complete testing that assesses concentration and attending; while some mental status examinations revealed memory, concentration and attention deficits, other examinations revealed intact cognitive functioning." (*Id.*)

For Plaintiff's ability to adapt or manage herself, the ALJ found that Plaintiff had mild limitations. (*Id.*) While Plaintiff contended that she had difficulties handling change

and managing her mood, the ALJ noted that "the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no significant problem getting along well with providers and staff and a generally normal mood and affect." (AR 39-40.)

Ultimately, the ALJ assigned the following RFC:

> [T]he claimant has the residual functional capacity to perform light work (lifting and carrying 20 pounds occasionally and ten pounds frequently) as defined in 20 CFR 404.1567(b) and 416.967(b) except stand/walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; occasionally climb ramps/stairs; never climb ropes/ladders/scaffolds; occasionally stoop, kneel, crouch and crawl; frequently reach overhead bilaterally; should avoid concentrated exposure to fumes, odors, dusts, gases, unprotected heights and moving/dangerous machinery. She is able to understand, remember and carry out simple instructions and tasks, should not work in a setting which includes constant/regular contact with the general public, and should not perform work that includes more than infrequent handling of customer complaints.

(AR 40.)

The ALJ then summarized Plaintiff's function reports as well as the Third-Party Function Report filled out by Mr. Hayes. (AR 41.) The ALJ assigned this opinion minimal weight "as it [was] a lay opinion based upon casual observation, rather than objective medical examination and testing. Further, it is potentially influenced by loyalties of friendship to the claimant." (AR 41-42.) The ALJ also found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 42.) He cited to function reports noting Plaintiff's ability to complete daily activities and interact with others. (*Id.*)

The ALJ then summarized Plaintiff's various examinations for her physical ailments, range of motions, left knee injections, treatments, and depression. (AR 43-44.) Specific to her mental disorders, the ALJ summarized Plaintiff's stays at the San Diego County Psychiatric Hospital. (AR 44-45.) During Plaintiff's June stay, she received a GAF score of 50, to which the ALJ assigned "little weight . . . finding it an overestimate of the claimant's functional limitations in light of her appropriate interactions with others and

generally intact cognitive function." (AR 44.) During Plaintiff's early July stay, she received a GAF score of 55-60, to which the ALJ "assigned some weight since it is more consistent with the overall evidence of record, though GAF scores are only snapshots of an individual's functioning level at the time such scores were rendered." (AR 44-45.) During Plaintiff's August stay, she received a GAF score of 45, to which the ALJ "assigned less weight since it appears this was rendered during an exacerbation of the claimant's underlying mental health impairments and is not a reliable indicator of the claimant's functional level with medication compliance/treatment." (AR 45.)

The ALJ then described Plaintiff's psychiatric consultative examination with Dr. Soliman, who diagnosed Plaintiff with major depression (severe with psychotic features) and assigned her a GAF score of 50. (AR 45.) To this, the ALJ "assigned less weight since it is inconsistent with the claimant's generally intact cognitive and interpersonal functioning." (*Id.*) Additionally, the ALJ found it notable that "although Dr. Soliman indicated the claimant reported that she had a college degree, the claimant denied this at the hearing." (AR 46.)

The ALJ also stated as its own paragraph that "the claimant is an obese individual and has been advised to lose weight but failed to follow through with treatment with a nutritionist." (*Id.*)

Regarding opinion evidence, he assigned treating physician Dr. Garrett's statement that Plaintiff is unable to work "little weight . . . as it is vague, conclusory, fails to offer a function-by-function assessment of the claimant's limitations and is on an issue reserved to the Commissioner." (*Id.*)

The ALJ assigned Dr. Soliman's opinion that Plaintiff "could not interact with coworkers, supervisors and the general public or withstand the stress/pressures associated with an eight-hour workday and with day-today activities" some weight. (*Id.*) The ALJ wrote the following:

> The undersigned assigns some weight to this opinion, agreeing that the claimant is best suited to simple instructions due to her underlying cognitive

deficits, but [found] that she can tolerate some interaction with others (as set forth in the residual functional capacity assessment adopted herein) due to her adequate interactions with examining/treating physicians and residual daily activities.

(*Id.*)

The ALJ assigned Dr. Lim's opinion that Plaintiff would likely be absent from work once a month but would not be off task in the workplace due to mental health symptoms "more weight." (AR 46-47.) He found the following:

[T]he limitations identified therein are consistent with the claimant's generally normal mental status examinations and appropriate interactions with examining/treating physicians. However, giving her the utmost benefit of the doubt, the undersigned has adopted additional restrictions not noted by Dr. Lim in order to accommodate any underlying irritability and distractibility with higher complexity tasks.

(AR 47.)

The ALJ assigned Dr. Rudnick's and Dr. Payne-Gair's opinions that the claimant had mild restriction with activities of daily living, moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace, and no repeated episodes of decompensation (of extended duration) "great weight." (*Id.*) He found that "these assessments [were] consistent with the claimant's intact daily activities, underlying irritability, frustration, anger issues, suicidal ideation and anticipated difficulty with more complex tasks." (*Id.*) The ALJ also stated the following:

Dr. Rudnick further found the claimant had moderate limitations understanding, remembering and carrying out detailed instructions, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, working in coordination with or in proximity to others without being distracted by them, completing a normal workday/week without interpretations from psychologically based symptoms, performing at a consistent pace without an unreasonable number/length of rest periods interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors and with responding appropriately to changes in the work setting (Exhibits 1A, 2A). Despite these difficulties, Dr. Rudnick found the claimant retained the

ability to adapt to expectable work place changes in a lower stress work environment, accept supervision, engage in minimal public interactions, persist, attend and maintain acceptable pace for a normal work schedule and understand/remember three and four-step uncomplicated instructions. (Exhibits 1A, 2A) In January 2016, Celine Payne-Gair, Ph.D. affirmed this opinion (Exhibits 5A, 6A) . . . In January 2016, Dr. Payne-Gair opined the claimant had moderate limitations understanding, remembering and carrying out detailed instructions, maintaining attention/concentration for extended periods, completing a normal workday/week without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number/length of rest periods, interacting appropriately with the general public, accepting instructions and responding appropriately to criticism from supervisors and with responding appropriately to changes in the work setting (Exhibits 5A, 6A).

(AR 47-48.) To these opinions, the ALJ assigned "partial weight," finding the following:

> [T]he claimant's distractibility, anger, irritability and high frustration levels would rule out any detailed work tasks (as contemplated in the residual functional capacity assessment adopted above), any constant/regular contact with the general public, or any work that includes more than infrequent handling of customer complaints. However, assuming she is limited to simple, routine tasks, the undersigned finds she would have minimal difficulty maintaining attention/concentration on such tasks and completing a normal work schedule.

(AR 48.)

Finally, the ALJ found that Plaintiff was capable of performing past relevant work as a small products assembler I, DOT #706.684-022, thus making her ineligible to receive benefits. (AR 48.)

On July 23, 2018, Plaintiff submitted a memorandum to the Social Security Appeals Council appealing the ALJ's decision. (AR 384-86.) Plaintiff contended that the ALJ erred by not evaluating properly the medical opinion of Dr. Soliman, an examining physician, (AR 384), and abused his discretion by relying on vague or improper evidence in evaluating his findings and discounting Dr. Garrett's, Plaintiff's chiropractor's, opinion (AR 385-86).

On January 23, 2019, the Appeals Council denied Plaintiff's request for review, finding no reason under its rules to review the ALJ's decision. (AR 4.)

1

## III. STANDARD OF REVIEW

A district court will not disturb the Commissioner's decision unless it is based on legal error or not supported by substantial evidence. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).[7] Substantial evidence means more than a scintilla, but less than a preponderance. *Id.* Substantial evidence is evidence that a reasonable mind would consider adequate to support a conclusion. *Id.* The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence is subject to more than one rational interpretation, the ALJ's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## IV. DISCUSSION

Plaintiff challenges the ALJ's unfavorable decision on four grounds. First, Plaintiff contends the ALJ erred by failing to find that Plaintiff met criteria meeting or equaling a listed disability impairment. Second, Plaintiff contends the ALJ erred in according inadequate weight to an examining physician and too much weight to non-examining physicians. Third, Plaintiff contends the ALJ erred in failing to rectify a contradiction between her assigned RFC and the Dictionary of Occupational Titles' definition for her past relevant work. Fourth, Plaintiff contends the Medical Vocational Guidelines direct a finding of disability due to her age, education, work experience, and RFC. The Court addresses each assignment of error in turn.

## A. The ALJ Did Not Properly Evaluate Plaintiff's Listing 1.02 Criteria.

Plaintiff contends that the ALJ erred by failing to find that Plaintiff met Listing 1.02 level impairment for two reasons. First, the ALJ ignored Plaintiff's subluxation of the

---

[7] Smolen has been superseded on other grounds by 20 C.F.R. § 416.929 and 20 C.F.R. § 404.1529(c)(3). *See Schuyler v. Berryhill*, No. CIVIL 17-00277 LEK-KSC, 2018 U.S. Dist. LEXIS 162334, at *26 n.23 (D. Haw. Sep. 21, 2018), *Sawaguchi v. Colvin*, No. CIVIL 16-00255 LEK, 2017 U.S. Dist. LEXIS 65457, at *11 n.6 (D. Haw. Apr. 28, 2017) (citation omitted).

19-CV-604-JM(WVG)

patella and joint space narrowing in the knee, two conditions that are part of this listing. Second, the ALJ erroneously found that Plaintiff ambulated effectively. Defendant contends that Plaintiff waived the issue of meeting Listing 1.02 level impairment by neither raising it before the ALJ nor before the Appeals Council. Furthermore, Defendant contends that had Plaintiff previously raised this issue, the ALJ nonetheless ruled properly that Plaintiff did not meet the listing criteria. The Court agrees with Plaintiff for the reasons set forth below.

### 1.    Plaintiff Properly Raised the Listing 1.02 Issue Before the Court.

Before a reviewing court, plaintiffs cannot raise issues that they did not raise earlier before an ALJ or the Appeals Council. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2018); *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). In *Meanel*, the Ninth Circuit found that "when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal." 172 F.3d at 1115. However, district courts in the Ninth Circuit have distinguished and declined to apply *Meanel* where the claimant failed to present an argument or issue to the ALJ but presented it to the Appeals Council in a subsequent request for review of the ALJ's decision. *See, e.g.*, *Gomez v. Berryhill*, 2017 U.S. Dist. LEXIS 95882, at *5-6 (C.D. Cal. June 21, 2017); *Ruiloba v. Colvin*, 2016 U.S. Dist. LEXIS 70846, at *13-15 (C.D. Cal. May 31, 2016); *Chin v. Colvin*, 2015 U.S. Dist. LEXIS 43876, at *18-19 (D. Haw. Apr. 2, 2015). When district courts have applied *Meanel*, the claimant had failed to present the issue to both the ALJ and Appeals Council. *See, e.g.*, *Guerrero v. Colvin*, 2017 U.S. Dist. LEXIS 64248, at *18-19 (S.D. Cal. Apr. 26, 2017); *Simpson v. Colvin*, 2016 U.S. Dist. LEXIS 71648, at *3-4 (C.D. Cal. May 31, 2016); *Harhaw v. Colvin*, 2014 U.S. Dist. LEXIS 32256, at *13 (E.D. Cal. Mar. 10, 2014).

Here, Defendant contends that "the issue is not proerply [*sic*] before this court" because Plaintiff failed to "raise the issue of whether she satified [*sic*]" Listing 1.02 criteria. (Doc. No. 17 at 11.) Plaintiff contends that because the ALJ and Appeals Council share a duty to investigate all issues, raising whether Plaintiff met Listing 1.02 criteria before the

ALJ or Appeals Council is unnecessary to preserve it. (Doc. No. 19 at 4.) Plaintiff cites *Sims v. Apfel*, 530 U.S. 103 (2000), arguing that it is the ALJ's and Appeals Council's duty to "fully develop the record, investigate facts, and develop arguments both for and against the claimant." (*Id.*) In *Sims*, the Supreme Court ruled that "[c]laimants who exhaust administrative remedies need not also exhaust issues in a request for review by the Appeals Council in order to preserve judicial review of those issues." 530 U.S. at 112. By only citing to this case, Plaintiff ignores the Ninth Circuit's distinction of *Sims*, where *Meanel* "remains binding on this court with respect to proceedings before an ALJ." *Shaibi*, 883 F.3d at 1109. Accordingly, Plaintiff had to have raised the issue before the ALJ or Appeals Council in order to have preserved it.

In any event, Plaintiff contends that she did raise her knee issue at the hearing before the ALJ. While Plaintiff stated that she experienced pain in her left knee due to "bone to bone, no cartilage" (AR 62), and that knee pain affected how long she could stand, sit, and ambulate (AR 65),  Plaintiff did not refer specifically to "Listing 1.02" in either the Representative Brief before the ALJ, during the ALJ hearing, or in the Representative Brief before the Appeals Council (AR 56-71, 378-86). Despite this, Plaintiff nevertheless raised before the ALJ the Listing 1.02 criteria: an MRI showing subluxation of the patella, x-rays showing joint space narrowing of the knee, and her inability to ambulate effectively. (AR 382.) Accordingly, the Court will consider this issue.

## 2. The ALJ Erred by Not Adequately Considering Whether Plaintiff's Impairments Met Listing 1.02 Criteria.

The Court must find that Plaintiff is disabled if she satisfies both Listing 1.02 criteria for major dysfunction of a joint and has met the duration requirement, the latter which is not under consideration. 20 C.F.R. § 416.920(a)(4)(iii), 20 C.F.R. § 416.920(d). As applicable here, the listing requirement is "[c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space

19-CV-604-JM(WVG)

narrowing, bony destruction, or ankylosis of the affected joint(s)" as well as the "[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

The SSA generally defines the inability to ambulate effectively as "an extreme limitation of the ability to walk." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(1). The Listing criteria provide examples of what are and what are not effective ambulation. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2). As applicable here, effective ambulation includes "the ability to travel without companion assistance to and from a place of employment or school," while "ineffective ambulation include[s], but [is] not limited to, . . . the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.*

In evaluating claims, an ALJ's step three evaluation must find support by substantial evidence in the record. *See Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999); *Smolen*, 80 F.3d at 1279. Furthermore, the ALJ "must evaluate the relevant evidence" when determining whether a claimant meets the listing requirements and avoid a "boilerplate finding . . . to support [the] conclusion." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (citing *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990)).

Here, Plaintiff contends that the ALJ erred by ignoring evidence in the record that Plaintiff had subluxation of the patella, joint space narrowing in the knee, and ineffective ambulation. In relevant part, the ALJ found the following:

> The claimant's knee impairment does not meet listing-level severity under §1.02 because there is no evidence of gross anatomical deformity of the hip, knees, shoulders, elbows or wrists and no medically acceptable imaging showing joint space narrowing, bony destruction or ankylosis of the affected joints resulting in inability to ambulate effectively or inability to ambulate or to perform fine and gross movements effectively . . . In this case, physical

examinations do not reveal a need for assistive devices as contemplated above, nor any other evidence of gait/ambulation deficits.

(AR 38.)

However, as Plaintiff points out, an MRI of her left knee on June 27, 2016, revealed subluxation of the patella (AR 579-80), and an x-ray of her left knee on May 14, 2016, revealed joint space narrowing (AR 691). The ALJ did not acknowledge these necessary impairments in his analysis. (AR 38.) However, these findings only satisfy part of the Listing 1.02 requirements, because these conditions would also have to result in the inability to ambulate effectively. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02(A). The ALJ found no "evidence of gait/ambulation deficits." (AR 38.) However, Plaintiff contends the ALJ erred in ruling that she can ambulate effectively. In determining that Plaintiff could ambulate effectively, the ALJ provided two reasons: (1) Plaintiff required no assistive devices, and (2) physical examinations did not reveal "any other evidence of gait/ambulation deficits." (*Id.*) The issue, therefore, is whether substantial evidence supports these findings.

### a. Evidence Exists Where Plaintiff Ambulated Effectively.

Defendant emphasizes Plaintiff's lack of assistive devices, noting that a "physcial [*sic*] examination did not reveal a need for assistive devices," that earlier "Plaintiff made no use of assistaive [*sic*] devices," and that "Plaintiff ambulated at the hearing without the need of an assistaive [*sic*] device." (Doc. No. 17 at 9-10.) Defendant further cites to an appointment on March 25, 2015, where the examining nurse noted that Plaintiff used no assistive devices (AR 815), and to Stacy Little, P.A.-C, who noted on August 4, 2016, that Plaintiff's gait was "[w]ithout limp or use of cane/walker" even though Plaintiff's subjective evaluation that visit indicated knee instability, swelling, pain in general, pain with walking up and down steps, and impaired mobility (AR 1015, Doc. No. 17 at 9-10). Defendant lastly cites to subjective function reports completed by Plaintiff and a third-party friend that make no references to needing such assistive devices. (Doc. No. 17 at 10.) Despite a record suggesting no use of these devices, and Plaintiff making no use of them

at the hearing (AR 43), on September 1, 2015, a Health ED Progress appointment noted that Plaintiff "[w]alks with pain and use [*sic*] cane and walker" (AR 532). Additionally, Plaintiff's representative brief before the ALJ cites to this appointment, writing that Plaintiff "walks with pain and additionally uses a cane or walker to walk." (AR 382.) The ALJ did not discuss this part of the record.

Taking as true, however, that Plaintiff never needed an assistive device would not equate to effective ambulation because use of an assistive device is not required to meet a Listing 1.02 level impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2). Social Security regulations provide that "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

Moreover, in addition to finding no use of assistive devices, the ALJ also found that no physical examinations revealed "any other evidence of gait/ambulation deficits." (AR 38.) To support this contention, Defendant cites to parts of the record noting Plaintiff's ability to walk without ambulatory deficits. (Doc. No. 17 at 9-11.) On March 25, 2015, after Plaintiff suffered a car accident, she could move "[e]xtremities without obvious pain deformity or dislocation except for a minor contusion on the left anterior tibia" and she could move "all 4 extremities with good strength good range of motion." (AR 387, 786.) On August 12, 2015, Dr. Soliman stated that Plaintiff's gait and posture were "normal." (AR 487.) During an appointment at Scripps Mercy Hospital on August 16, 2015, Dr. Deaver found that Plaintiff had "no difficulty ambulating," "a steady ambulatory gait," and "a steady gait." (AR 913-16.) On August 11, 2016, Plaintiff visited the emergency room at Scripps Mercy Hospital by "ambulatory" means, where examining Dr. Chillar noted that Plaintiff "[d]enie[d] any back pain or leg pain." (AR 919.) On August 1, 29, and September 12, 2016, Dr. Korsh examined Plaintiff and found her to have a normal gait, normal heel-walk, and normal toe-walk. (AR 732, 746, 754, 758-59.) Plaintiff most frequently visited Family Health Centers of San Diego where Physician Assistant Stacey Little was her primary caregiver. (AR 957-1115.) Over nearly two years of visits, Family Health Centers

found Plaintiff's gait "normal" on July 22, 2015,[8] September 9, 2015, December 23, 2015, April 14, 2016, May 19, 2016,[9] September 8, 2016,[10] September 20, 2016, December 29, 2016, January 17, 2017, February 2, 2017,[11] March 14, 2017, and April 27, 2017. (AR 1080, 1075, 1058, 1049, 1040, 998, 993, 979, 976, 967, 1100, 1090).

Although the ALJ did not discuss these findings under his step three analysis, ALJs may incorporate evidence elsewhere in the record to support a finding under a different section of their decision. *Lewis*, 236 F.3d at 513; *Perez v. Astrue*, 831 F. Supp. 2d 1168, 1176 (C.D. Cal. 2011). Here, the ALJ cited earlier subjective function reports from June 21, 2015, where Plaintiff admitted that "she independently showered, administered her own medications, used public transportation, attended doctors' appointments, prepared meals, did light laundry, could go out alone, was able to drive, shopped in stores, [and] handled finances." (AR 42, 321-31.) In the same function report, Plaintiff also admitted to the ability to walk two blocks before needing to rest (AR 328), although in a later pain questionnaire, Plaintiff limited her ability to only being able to walk one block before needing to rest (AR 342).

Lastly, Defendant contends that Plaintiff's knee injections meant that "she did not have an inability to ambulate effectively or have an extreme limitation in walking subsequent to treatment." (Doc. No. 17 at 10-11.) Defendant attempts quoting to regulations, stating that "[t]reatment must be considered 'in terms of its effectiveness in

---

[8] During this visit, Plaintiff also had "[g]rossly normal range of motion, no ext edema" although later she was diagnosed with edema. (AR 1080.)

[9] During this visit, Plaintiff also had a "normal" weight despite at the time weighing approximately 304 pounds with a BMI of 50.6. (AR 1040.)

[10] During this visit, Plaintiff also had a "normal" weight despite weighing at the time 315 pounds with a 52.4 BMI. (AR 998.)

[11] During this visit, Plaintiff also had a "normal" weight although they did not measure her weight this visit. (AR 967.)

ameliorating the signs, symptoms and laboratory abnormalitities [*sic*] of [the] disroder [*sic*].'" (Doc. No. 17 at 11 (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00, Musculoskeletal System, I.2.).) Between May and September of 2016, Plaintiff received four knee injections, which alleviated pain. (AR 700, 748, 756-57, 759-60.) She first received a steroid injection on May 16, 2016, from Dr. Kelly, who recommended that she return every 3-4 months for further injections. (AR 700.) While the record does not indicate her returning to Dr. Kelly for additional injections, Plaintiff did receive platelet-rich plasma ("PRP") injections from Dr. Korsh on August 1, 29, and September 12, 2016. (AR 748, 756-57, 759-60.) During Plaintiff's second appointment with Dr. Korsh, she noted that the previous injection "worked great, I need another," because it reduced her pain. (AR 757.) During her last appointment, Dr. Korsh reiterated that the injections were helpful, and that Plaintiff needed to follow up; however, the record indicates this was her last appointment with him. (AR 759-60.)

These injections reduced pain, but their effectiveness does not automatically discredit Plaintiff from meeting a Listing 1.02 impairment. That they provide long-term relief and cure all gait or ambulatory deficits is conjecture, especially considering the short timeframe within which the doctors administered these injections and the continued issues Plaintiff faced after September 2016. Despite this, further treatment that the ALJ and Defendant did not include comes from an appointment at Family Health Centers on July 6, 2017, where Physician Assistant Little stated that "pain in [Plaintiff's] knees remains the same at 7/10 on the VAS scale and Norco helps this pain so that she can do her ADLs [activities of daily living]." (AR 1033.) This too, however, does not constitute substantial evidence to negate a contended disabling impairment without further inquiry, which remand may satisfy. While treatment is a factor an ALJ must discuss when evaluating a case, the ALJ neither based his conclusion on Plaintiff's treatment nor specified that such treatment prevented Plaintiff from being disabled.

19-CV-604-JM(WVG)

### b.  Evidence Exists Where Plaintiff Did Not Ambulate Effectively.

While the evidence provided by Defendant as well as that to which the ALJ cited may in isolation constitute substantial evidence that Plaintiff could effectively ambulate, the ALJ did not cite the physical examinations discussing Plaintiff's ambulatory deficits. Rather, he erroneously found that the record did not show "any other evidence of gait/ambulation deficits." (AR 38.) The Court "cannot affirm the examiner's conclusion simply by isolating a specific quantum of supporting evidence." *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984) (citing *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).

At Family Health Centers of San Diego, medical records indicated that Plaintiff's gait was "slow" on October 13, 2015, May 16, 2016, June 9, 2016, August 16, 2016, November 29, 2016, and May 18, 2017. (AR 509, 1063, 699, 1030, 1008, 985, 1085.) During a January 19, 2017, appointment, Physician Assistant Stacey Little found that Plaintiff had an "antalgic gait," and during the same appointment Plaintiff wore a "left knee brace . . .  and compression hose bilat[eral]." (AR 972.) Ms. Little also stated that Plaintiff "remains in chronic pain" and that "walking is becoming difficult with the left knee." (AR 972.) Additionally, the function reports that the ALJ cited elsewhere in his decision also point to Plaintiff's diminished ability to climb stairs (AR 328), and she stated during the ALJ hearing that she "can't do stairs" and that "stairs are a big problem" (AR 68, 70).

In determining whether substantial evidence supports the ALJ's conclusion, the Court also notes the ALJ's failure to discuss the Bruce protocol[12] stress test conducted by Dr. Szkopiec on February 1, 2017. (AR 768.) According to Dr. Szkopiec, "[t]he test was initiated at stage I of the Bruce protocol with speed velocity of 1.9 miles per hour, but had to be decreased to 1.5 with an elevation of 5% due to the patient's inability to keep up with

---

[12] The Bruce protocol is "a standardized protocol for electrocardiogram-monitored exercise using increasing speeds and elevations of the treadmill . . . ." 731190 Bruce protocol, Stedmans Medical Dictionary 731190.

the 1st stage . . . ." (*Id.*) After Plaintiff walked for 2 minutes and 30 seconds under these reduced parameters, the test "had to be stopped because of weakness of the legs and dyspnea." (*Id.*) This equates to walking 330 feet[13] before needing to rest from weakness, suggesting that Plaintiff can barely walk a block at a reduced speed. The ALJ cited to a questionnaire where Plaintiff "alleged she could only walk one block"[14] as well as a function report filled out by a third-party friend, which the ALJ found "not persuasive," alleging that Plaintiff had "difficulty walking more than two blocks." (AR 41-42.) However, the ALJ failed to cite to the results of this stress test, a finding that could have cast further light on Plaintiff's ambulatory abilities. One would believe that if Plaintiff could only walk 330 feet at a reduced pace during a medical test before tiring, then she cannot "walk a block at a reasonable pace on rough or uneven surfaces." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2).

The ALJ also misstated the record when discussing Plaintiff's left heel and eventual plantar fasciitis diagnosis, suggesting that this condition did not receive accurate attention when considering Plaintiff's ambulatory abilities. The ALJ noted that Plaintiff experienced left heel pain in April 2016, after stepping off a curb, referred to her repeated pain complaints from May 2016, and then asserted "a gap in treatment for this condition until October 2017," over a year later. (AR 37-38). However, the appointment to which the ALJ cited detailed a visit actually dated June 22, 2016, with a *fax transmission* to Plaintiff's attorney dated in October 2017. (AR 951.) While potentially harmless error, the ALJ's oversight created a year gap in the record and warrants a closer look into the rest of his analysis on this exhibit.

---

[13] One and a half miles per hour equals 7,920 feet per mile, which equals 132 feet per minute. After two and a half minutes, Plaintiff walked approximately 330 feet.

[14] In a separate pain questionnaire from June 1, 2015, Plaintiff alleged she could walk two blocks before needing to rest; however, this statement was nearly two years before the stress test. (AR 328.)

19-CV-604-JM(WVG)

Relying on these visits, the ALJ cited "conservative" treatment for Plaintiff's plantar fasciitis as well as "symptomatic improvement with treatment compliance." (AR 38.) At Plaintiff's first appointment on June 22, 2016, Dr. Foygelman noted a strength grade of 4/5 for the left heel region, ankle joint dorsiflexion of zero degrees with the knee extended bilateral, and a pain rating of 5/10. (AR 951.) While Dr. Foygelman stated during Plaintiff's remaining visits that "[s]he has been following all instructions and feels a little bit better" (AR 953-55), her last recorded visit with him on October 7, 2016, stated once again a strength grade of 4/5 for the left heel region, ankle joint dorsiflexion of zero degrees with the knee extended bilaterally, and a pain rating at 5/10, suggesting that plaintiff did not enjoy total symptomatic improvement (AR 955).

In addition to the moisturizing cream prescribed to Plaintiff on June 22, 2016, and a night splint dispensed to Plaintiff on August 10, 2016, (AR 952-953) to which both the ALJ cited, Dr. Foygelman also performed neutral suspension casting on Plaintiff's feet to provide "custom-made functional orthotic devices," (AR 952.) When Plaintiff received these devices during an appointment on October 7, 2016, Dr. Foygelman noted that the devices were to "help to place the foot in a more normal functioning position in gait." (AR 955.) He noted that she was "able to ambulate without distress with use of the custom made orthotic devices with shoes." (AR 955.) Despite Dr. Foygelman stating during the June 22, 2016, appointment that "patient can heel and toe walk with ease as well as arise from a seated position unassisted," the fact that the orthotic devices improved Plaintiff's ambulation may also suggest prior ambulatory deficits. (AR 951.) If these devices treated her impairments to the point they alleviated the contended disability, then the ALJ should have referenced this as well in his conclusion. On the other hand, a closer analysis into this issue may have contravened the ALJ's assertion that physical examinations did not reveal "any other evidence of gait/ambulation deficits." (AR 38.)

Finally, the record also indicates that Plaintiff's morbid obesity, a condition the ALJ failed to analyze adequately, could have also evidenced gait or ambulatory deficits. In *Celaya*, the Ninth Circuit remanded the proceeding for the ALJ to conduct "a step-three

multiple impairment analysis that explicitly accounts for the direct and marginal effects of the plaintiff's obesity. . . ." *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). Despite this holding, the dissent emphasized the majority's own estimated BMI and its "judicially diagnosed" obesity of the 4'9" 205-pound plaintiff, noting the record's implicit treatment of this condition. *Id.* at 1185, n.3. In *Burch*, the court limited obesity discussions by noting that "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (citation omitted). Furthermore, the record detailed meager evidence to establish that Plaintiff, who weighed 222 pounds, experienced functional limitations due to obesity, a point the court emphasized. *Id.* Concurring with the district court, it found that "[t]here was no evidence before the ALJ, and none in the record, which states that claimant's obesity limits her functioning." *Id.*

Here, however, Plaintiff is factually obese. Unlike in *Celaya* or *Burch* where the record did not specifically diagnose claimants with this condition, Plaintiff's obesity diagnosis appeared throughout the record. Doctors labeled Plaintiff as obese in July 2015 when she weighed 258 pounds (AR 477), and during the next two years, her weight increased 83 pounds to 341 pounds with a BMI of 56.8 in May 2017 (AR 1072). Even at 315 pounds, Plaintiff's stated weight during the hearing (AR 60), Plaintiff weighed approximately 100 pounds more than the claimants in *Celaya* or *Burch*. *See Celaya*, 332 F.3d at 1182; *Burch*, 400 F.3d at 683. Furthermore, Plaintiff received obesity diagnoses throughout the record. On September 9, 2015, Physician Assistant Little instructed Plaintiff to "continue weight loss and avoid spicy/greasy fatty foods" (AR 520), and during a January 6, 2017, hospital visit, Dr. Szkopiec included in Plaintiff's plan a "no added salt diet and calorie restriction" (AR 767). Similarly, Dr. Santoyo referred to Plaintiff as "SEVERELY MORBIDLY OBESE," and included the following in his assessment: "STOP EATING SALTY FOODS / FATTY FOODS[,] CARDIO REFERRAL[,] MONITOR WEIGHT" (emphasis in original). (AR 1012-13.)

19-CV-604-JM(WVG)

Plaintiff's obesity could also potentially complicate contemplated medical procedures. After Plaintiff's March 2015 car accident, an Emergency Department physician stated that Plaintiff's findings were "[s]omewhat limited due to obesity" for her cervical spine computed tomography, a chest examination, and an abdomen and pelvis examination. (AR 392-93, 401-02.) During a January 6, 2017, hospital visit, Dr. Szkopiec stated that Plaintiff's abdomen was difficult to exam due to obesity. (AR 767.) On January 19, 2017, Nurse Practitioner Little noted that "walking is becoming difficult with the left knee OA[15] [and that Plaintiff] can not [*sic*] have surgery due to her obesity." (AR 972.) While the ALJ noted Plaintiff's "conservative" treatment for foot, neck, and back pain (AR 38, 44), Dr. Kelly noted on May 16, 2016 that "[w]eight loss is recommended. If she wishes to meet with a surgeon, her BMI must be under 35kg/m2" (AR 700). At that time, her BMI was 49.92 kg/m2, (AR 699), and one year later in May 2017, her BMI increased to 56.8kg/m2 (AR 1072). Thus, conservative treatment does not only equate to mild ailments, but also likely stems from her obesity.

The ALJ also failed to discuss obesity at all during his step three analysis. (AR 38-40.) Under step two, the ALJ found that Plaintiff's sever impairments were "degenerative changes of the cervical spine, lumbar spine and left knee; *obesity*; tobacco-related breathing difficulties and depressive disorder." (AR 36 (emphasis added).) At step three, the ALJ must discuss whether one of these impairments, or a combination of these impairments, meets or equals the severity of a listed impairment. 20 C.F.R. § 416.920(a)(4)(iii). The ALJ discussed all the above found severe impairments with the exception of even writing "obesity" at step three. (AR 38-40.) Elsewhere in his decision, the ALJ briefly referenced this word three times.[16] While *Burch* holds that an ALJ need not consider issues for which

---

[15] "OA" is an abbreviation for osteoarthritis, for which obesity can be a risk factor. *See* 9-252-15 Courtroom Medicine Series: The Knee and Its Related Structures § 15.30 (2015).

[16] The ALJ mentioned this word when stating that Plaintiff "endorsed chronic knee/back pain and limitations stemming from obesity" (AR 42), when devoting an entire paragraph,

plaintiffs do not present evidence to establish a listing equivalency, it is nonetheless the ALJ's responsibility to "evaluate each case based on the information in the case record." SSR 02-1p, 2002 SSR LEXIS 1, at *15, 2002 WL 3468281 at *6. Plaintiff discussed her weight at the hearing, and the Listing 1.02 issue Plaintiff raised considers her ability to ambulate effectively, something a reasonable mind could find that the severe impairment of morbid obesity affects.

Accordingly, the ALJ ignored numerous citations to Plaintiff's obesity and multiple reports stating the inability for effective ambulation, meaning that without further explanation and analysis of the record, the ALJ did not base his Listing 1.02 conclusion on substantial evidence.

### 3.    Summary and Conclusion.

Contrary to the ALJ's assertion that physical examinations did not reveal "any other evidence of gait/ambulation deficits," physical examinations showed evidence for both effective and ineffective ambulation. (AR 38.) While further explanation may find that substantial evidence supports Plaintiff not meeting a Listing 1.02 level impairment, the ALJ failed to show this by not analyzing the entire record in reaching his conclusion. Rather, he provided a "boilerplate" conclusion, writing that no physical examination

---

and failing to punctuate it, by writing "Furthermore, the claimant is an obese individual and has been advised to lose weight but failed to follow through with treatment with a nutritionist . . . ." (AR 46) and when writing that "[c]onsidering the combined effect of her orthopedic impairments, obesity and breathing difficulties, the undersigned finds she is limited to a range of work at the light exertional level, but with the additional postural and environmental limitations noted above." (AR 48.) The ALJ did mention that Plaintiff failed to follow up with a nutritionist, and regulations do state that if a Plaintiff "[does] not follow the prescribed treatment without a good reason, we will not find [them] disabled . . . ." 20 C.F.R. § 416.930(b) (current through the July 6, 2020 issue of the Federal Register); *see Covarrubias v. Colvin*, No. 15-CV-2664-DMS(WVG), 2016 U.S. Dist. LEXIS 182327, at *41-42 (S.D. Cal. Nov. 17, 2016). While this issue may be considered on remand, the ALJ did not discuss obesity in nearly enough detail to warrant his findings on this conclusion, neither fully discussing Plaintiff's obesity issue, her potential treatment, how much treatment she declined, or whether she had "good reason" for doing so.

showed the need for assistive devices, while excluding an examination that noted Plaintiff's use of a cane and walker (AR 532) as well as Plaintiff's assertion of this fact in her brief before the ALJ (AR 382). Multiple examinations noted that Plaintiff had normal gait and ambulation, yet the ALJ failed to cite or reconcile multiple examinations noting a slow gait. Furthermore, the ALJ failed to cite a stress test indicating difficulty walking 330 feet, misstated the timeline of Plaintiff's appointments with Dr. Foygelman, and did not fully discuss Plaintiff's improvement or treatments with this doctor. Finally, the ALJ did not discuss the effect of Plaintiff's obesity on her ability to ambulate, a condition described in detail throughout the record that has prevented her from adequate examinations and from attaining certain surgery.

In a persuasive opinion, the Ninth Circuit has remanded a case where the ALJ "ended his step-three inquiry prematurely" by stating that the claimant did not need an assistive device and failed to analyze whether the claimant could ambulate effectively despite evidence in the record potentially supporting a different finding. *Dobson v. Astrue*, 267 F. App'x 610, 612 (9th Cir. 2008). Here, the ALJ similarly ended his Listing 1.02 analysis without discussing numerous points in the record that could support a contrary outcome.

The ALJ's decision was not based on substantial evidence in the record and was thus in error. Accordingly, this Court recommends remanding for reconsideration of this issue in light of the entire record.

**B.    The ALJ Did Not Accord Proper Weight to Dr. Soliman's, Dr. Rudnick's and Dr. Payne-Gair's Medical Opinions.**

Plaintiff contends that the ALJ erred by according inadequate weight to the opinion of an examining physician, Dr. Soliman, and assigning great weight to the opinions of non-examining physicians, Dr. Rudnick and Dr. Payne-Gair, for two reasons. First, the ALJ failed to provide specific and legitimate reasons as to why he did not assign great weight to the examining physician's opinion. Second, the ALJ failed to corroborate the non-examining physicians' findings with existing evidence in the record. Defendant contends

that the ALJ properly assessed the physicians' findings. The Court agrees with Plaintiff for the reasons set forth below.

### 1. The ALJ Did Not Provide Specific and Legitimate Reasons to Accord Dr. Soliman's Opinion Less Weight Than the Non-examining Physicians' Opinions.

The Ninth Circuit distinguishes "among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal quotations and citation omitted). In most circumstances, a treating physician's opinion is entitled to the greatest weight, followed by an examining physician's opinion, and then a non-examining physician's opinion. *See Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008); *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995).

However, the ALJ is not required to, nor should he, pick a single medical opinion and adopt it wholesale. *Andrews*, 53 F.3d at 1041. When another doctor does not contradict the treating physician's or examining physician's opinion, an ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence. *Lester*, 81 F.3d at 830; *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). Alternatively, "[i]f a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (internal quotations and citation omitted). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Id.* (same). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (same). Because there is no specific "incantation" the ALJ must recite when making this determination, a reviewing court can still "draw[] specific and legitimate inferences

from the ALJ's opinion" when evaluating whether the ALJ met the substantial evidence standard. *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

Furthermore, an ALJ can discount a physician's opinion that is based on a plaintiff's subjective complaints absent "clinical or otherwise reliable evidence." *Brawner v. Sec'y of Health & Human Servs.*, 839 F.2d 432, 434 (9th Cir. 1988). Accordingly, for ALJs to reject a plaintiff's subjective complaint, they must provide "specific, cogent reasons for the disbelief." *Lester*, 81 F.3d at 834 (9th Cir. 1995) (quoting *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990)). "Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing[, and t]he ALJ must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 599 (9th Cir. 1999) (citations omitted). An ALJ may also consider a claimant's activities of daily living in his credibility analysis and deny benefits accordingly. *Burch*, 400 F.3d at 681 (citing *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Morgan*, 169 F.3d at 600 (9th Cir. 1999) (claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of claimant's ability to work)).

According to the ALJ, Dr. Soliman's opinion consisted of the following three findings: (1) Plaintiff can "understand, carry out and remember simple instructions, but not complex instructions," (2) Plaintiff cannot "interact with coworkers, supervisors and the general public," and (3) Plaintiff cannot "withstand the stress/pressures associated with an eight-hour workday and with day-to-day activities." (AR 46.) While the ALJ agreed with the first finding, he found that Plaintiff "can tolerate some interaction with others (as set forth in the residual functional capacity assessment adopted herein) due to her adequate interactions with examining/treating physicians and residual daily activities." (AR 46.) This finding contradicts the examining physician's opinion but aligns with the non-examining physicians who opined that Plaintiff only faced "mild restriction with activities of daily living, [and] moderate difficulties maintaining social functioning and maintaining

concentration, persistence or pace." (AR 47.) The issue therefore is whether the ALJ's explanation of Plaintiff's "adequate interactions with examining/treating physicians and residual daily activities" is based on specific and legitimate reasons, supported by substantial evidence in the record, to discount Dr. Soliman's second and third findings.

The ALJ's findings are indeed insufficient to meet this standard. That Plaintiff can adequately interact with physicians does not specify why she would be able to interact with co-workers, and simply referring to her residual daily activities without explanation does not specify why she can withstand the stress and pressures associated with an eight-hour workday. Elsewhere in the decision, the ALJ does cite to Plaintiff's function reports that state she could drive, use public transportation, shop, conduct chores, maintain personal hygiene, and see friends. (AR 39-42.) However, without further explanation, Plaintiff's implied functionality is belied by the ALJ acknowledging that Plaintiff "alleged she had pain with movement of her neck, was easily tired, had to sit and catch her breath while dressing herself, sometimes forgot to take her medication, had low energy levels, had difficulty focusing [and] sleeping, did not do house or yard work due to tiredness and shortness of breath and did not socialize with others" (AR 41), as well as by the same report expressing in more detail how Plaintiff "hates" shopping and only purchases a few items at the store, does not have a car, eats out most nights instead of preparing food, sometimes forgets to take medication, has breathing and mobility issues during personal hygiene routines, and sometimes has "problems getting along with family, friends, neighbors, or others" (AR 324-28).

Here, the ALJ failed to overcome the hurdle of providing specific and legitimate reasons. While the Court may draw from elsewhere in the ALJ's decision to support his reasoning, *see Magallanes*, 881 F.2d at 755, the Court may not affirm on a ground not stated by the ALJ, *see Bray v. Comm'r of SSA*, 554 F.3d 1219, 1225-26 (9th Cir. 2009). Inferring whether adequate interactions with physicians parallel on the job interactions with coworkers, or whether being able to use public transportation and visit grocery stores equates to withstanding the stress and pressures of day-to-day activities is not guess-work

for the Court. While Defendant correctly points out that "[i]nconsistencies between a one-time examining psychitrist [*sic*] and the longitudinal medcial [*sic*] record is a valid reason to discount the psychiatrist's findings," the ALJ not only failed to specify inconsistencies but also failed to provide specific and legitimate explanations. (Doc. No. 17 at 11.)

Defendant further contends that "[t]he ALJ properly discounted the psychiatrist's opinion where the opinion relied on Plaintiff's erroneous representations." (Doc. No. 17 at 12). However, this contention does not hold merit because the ALJ never specified Plaintiff's credibility as a basis for discounting Dr. Soliman's opinion. Despite Defendant's contention that Dr. Soliman's opinions "relied heavily on Plaintiff's own account of her signs and symtpoms [*sic*] without performing objective testing" (Doc. No. 17 at 12), the ALJ never alleged this to be the reason to accord Dr. Soliman's opinion less weight, specifying only that "[n]otably, although Dr. Soliman indicated the claimant reported that she had a college degree, the claimant denied this at the hearing" (AR 46). Furthermore, while Dr. Soliman identified "the claimant and accompanying records" (AR 487) as sources of information for his evaluation, Plaintiff correctly points out that Dr. Soliman did indeed produce clinical evidence by conducting objective testing, such as administering serial sevens, memory tests, and other cognitive-based questioning (AR 490). Finally, the ALJ accorded "some weight" to Dr. Soliman's opinion that Plaintiff could not interact with the general public or withstand the stress of an eight-hour work day, and "less weight" to his diagnosis of "major depression (severe with psychotic features) and . . . GAF score of 50." (AR 45.) Thus, Dr. Soliman's opinion was not based solely or primarily on Plaintiff's subjective complaints.

Thus, the Court finds that the ALJ did not accord Dr. Soliman's opinion proper weight because he failed to provide specific and legitimate reasons for discounting his opinion. This Court recommends the case be remanded so that the ALJ may reevaluate Dr. Soliman's opinion.

19-CV-604-JM(WVG)

## 2.    Other Evidence in the Record Does Not Support the Non-examining Physicians' Medical Opinions.

"The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831. An ALJ can only rely on a non-examining physician's findings over the treating physician's opinion if other evidence in the record supports these findings. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996). While earlier cases indicated that an ALJ can treat a non-examining physician's *testimonial* opinion as substantial evidence when supported by other evidence in the record, later rulings have loosened this standard to include support from testimonial and non-testimonial opinions. *Compare Morgan*, 169 F.3d at 602 ("[W]e have consistently upheld the Commissioner's rejection of the opinion of a treating or examining physician, based in part on the testimony of a nontreating, nonexamining medical advisor."); *Andrews*, 53 F.3d at 1041 ("[W]here the ALJ relied on a nonexamining source's testimony . . . the report of a nonexamining, nontreating physician need not be discounted when it 'is not contradicted by *all other evidence* in the record.'" (citation omitted) (emphasis in original)); *Lester*, 81 F.3d at 831 ("We have, in some cases, upheld the Commissioner's decision to reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor."); *Magallanes*, 881 F.2d at 752 (finding that an ALJ relying on a non-examining doctor's testimony could reject the opinion of a treating physician because it "is not contradicted by *all other evidence* in the record." (emphasis in original)); *with Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." (citation omitted)); *Ryan*, 528 F.3d at 1202 (same); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"); *Saelee*, 94 F.3d at 522 ("[T]he findings of a nontreating,

nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings"). Statutorily, "the weight [ALJs will afford nonexamining sources] will depend on the degree to which they provide supporting explanations for their medical opinions" and on "any factors . . . of which [the ALJ is] aware, which tend to support or contradict the medical opinion." 20 C.F.R. 404.1527(c)(3), (6).[17] As such, testimony of a non-examining source can be influential although not necessary to credit an opinion. Furthermore, the additional evidence provided by an ALJ to treat non-examining opinions as substantial evidence must come from the record, as neither the non-examining doctor's opinion alone, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990), nor "the ALJ's own observance of [the] claimant's demeanor at the hearing" constitute substantial evidence, *Gallant*, 753 F.2d at 1456 (9th Cir. 1984).

When the record contains contradictions, "[t]he ALJ is responsible for resolving conflicts in medical testimony, and resolving ambiguity." *Morgan*, 169 F.3d 595, 603 (citations omitted); *see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *Magallanes*, 881 F.2d at 750. This duty extends to determining which factors are relevant in discounting medical opinions. *Morgan* 169 F.3d at 603. While an ALJ can reject a medical opinion because the source did not consider all available evidence, *see Valentine v. Comm'r SSA*, 574 F.3d 685, 695 (9th Cir. 2009), an ALJ can still accord more weight to a non-examining opinion that lacked support from the record, *see Costandi v. Berryhill*, No. 2:17-cv-02019-JCM-DJA, 2019 U.S. Dist. LEXIS 225548, at *14 (D. Nev. Oct. 31, 2019) ("[T]he ALJ went through the entirety of the medical record and found it more consistent with the nonexamining physician's opinion"); *Green v. Saul*, No. 1:18-cv-00775-GSA, 2019 U.S. Dist. LEXIS 120891, at *24 (E.D. Cal. July 18, 2019) ("Plaintiff provides no legal authority for the proposition that a medical opinion ceases to be substantial evidence with the passage of time and the evolution of the claimant's

---

[17] These regulations only apply to claims filed before March 27, 2017, like the case at bar. For claims filed after March 27, 2017, section 404.1520c applies.

condition"); *Gonzales v. Astrue*, 960 F. Supp. 2d 1014, 1022 (N.D. Cal. 2013) (rejecting Plaintiff's assertion that the ALJ's decision would have been different had a non-examining physician reviewed later reports not available to him).

Here, the ALJ stated that non-examining, consultative doctors, Dr. Rudnick and Dr. Payne-Gair, found that Plaintiff had "[1] mild restriction with activities of daily living, [2] moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace, and [3] no repeated episodes of decompensation (of extended duration) . . . ." (AR 47.) The ALJ assigned these opinions "great weight" because they were "consistent with the claimant's intact daily activities, underlying irritability, frustration, anger issues, suicidal ideation and anticipated difficulty with more complex tasks." (AR 47.) Plaintiff contends that the ALJ erred because these opinions did not contemplate the entire medical record, the physicians did not testify at the hearing, and substantial evidence in the record did not support these findings.

Plaintiff first contends that the ALJ should have rejected the non-examining physicians' opinions because the physicians did not consider Plaintiff's psychiatric holds that occurred before they issued these opinions. (Doc. No. 12 at 22-23.) At face value, the logic that an ALJ must discount an opinion because it did not consider the entire medical record could lead to rejecting Dr. Soliman's opinion as well for not considering the two years of medical records submitted after his examination. The SSA avoids this issue by requiring the ALJ to resolve conflicts and ambiguities in incomplete opinions, even where an opinion did not have access to the entire record up until that point. *See Morgan*, 169 F.3d 595, 603.

Plaintiff then raises anew in reply that the ALJ should have discounted the non-examining opinions because they relied primarily on Plaintiff's physical, not mental health records. (Doc. No. 19 at 9.) While this issue is not properly before the Court because it was raised for the first time in a reply brief, neither the Court nor an ALJ could reject such opinions wholesale if other, independent evidence in the record supports these findings. Likewise, Plaintiff's contention that the ALJ should reject these opinions because the non-

examining physicians did not testify also fails—it is in the province of the ALJ to examine the entire record and make conclusions accordingly. However, this power does not go unchecked: the issue is whether other evidence in the record supports the ALJ's decision to accord the non-examining physician's opinions great weight. *See Lester*, 81 F.3d at 830-31.

Plaintiff contends that the record does not support the physicians' findings that she only has mild to moderate restrictions for daily living, concentration, and social functioning because of conflicting evidence from four hospitalizations at the County Psychiatric Hospital, statements from her treating psychiatrist at Family Health Centers, and an examination by Dr. Soliman. (Doc. No. 12 at 19.) Defendant contends that "the ALJ set forth a full and acurate [*sic*] discussion of [the non-examining physicians'] medical findings and the evidence upon which they based their findings." (Doc. No. 17 at 13.)

The ALJ did not discuss the stays at the County Psychiatric Hospital specifically when evaluating the non-examining physicians' opinions; however, elsewhere in his opinion he did elaborate on Plaintiff's four psychiatric hospitalizations between June and August 2015. (AR 44-45.) In each case, he noted Plaintiff's impaired state upon entering the hospital, her improved condition on discharge, and how two of these visits likely related to medication management and changes. (*Id.*) Furthermore, the ALJ stated the following to rebut the importance of these stays with respect to the entire record:

> Despite these hospital stays, other August and September 2015 emergency department visits for unrelated conditions revealed no depression, anxiety, racing thoughts, or thoughts of self-harm, with normal affect, an alert status and full orientation (Exhibit 7F). While some September-October 2015 outpatient treatment notes referenced some chronic depression, anxiety, nightmares, flashbacks, panic attacks, lethargy, lack of interest/appetite, decreased concentration and sadness, with diagnoses including PTSD and depressive disorder, the claimant consistently denied suicidal ideation and mental status examinations revealed normal speech, linear/coherent thought processes, a cooperative demeanor, no perceptual disturbances and normal

1  cognitive functioning, though some regressive self-soothing behavior was
2  noted (Exhibit 6F).

3  (AR 45.)

4      The ALJ cited specific exhibits to support his refutation of these hospital visits,
5  suggesting a finding that these stays were abnormal and against the greater weight of the
6  evidence. Plaintiff contends that in this balancing, the ALJ "downplayed these mental
7  health impairments." (Doc. No. 19 at 9.) However, while Plaintiff correctly identifies that
8  she indeed had suicidal ideations and that her psychiatric stays revealed inappropriate
9  behavior and serious issues (AR 598-600), the ALJ nonetheless recognized that Plaintiff
10 consistently denied suicidal ideations throughout the record and that her September-
11 October 2015 outpatient treatment notes painted a less serious picture than her psychiatric
12 stays (AR 534-38, 561-64, 1067-68, 529-31, 528-29, 526-27). While using "some
13 regressive self-soothing behavior" to describe Plaintiff's "rocking, pulling her punching,
14 punching haer [*sic*] face and sucking her thumb to 'comfort [herself]'" is an arguable
15 understatement (AR 531), the ALJ nonetheless balanced these opinions and showed "other
16 evidence in the record" to support his conclusions that Plaintiff's psychiatric stays
17 specifically did not contravene the non-examining physicians' opinions.

18     Plaintiff's final contention, that Dr. Soliman's opinion controverts the non-
19 examining physicians' opinions, holds the most weight. These opinions are at direct odds:
20 while Dr. Soliman opined that Plaintiff could not "withstand the stress/pressures associated
21 with . . . day-to-day activities" (AR 46), the non-examining physicians found "mild
22 restriction with activities of daily living," (AR 47). However, discounting an examining
23 physician's opinion and accepting a non-examining physician's opinion face different legal
24 standards. Discounting Dr. Soliman's examining opinion requires specific and legitimate
25 reasoning supported by substantial evidence, which, as explained above, the ALJ did not
26 meet. *Garrison*, 759 F.3d at 1012 (internal quotations and citation omitted). Accepting a
27 non-examining physician's opinion, however, requires a showing of other evidence in the
28 record that supports the finding. *Saelee*, 94 F.3d at 522.

78

Here, while some evidence in the record does not support only mild restrictions with daily living activities, other evidence does support this finding. In the subsection immediately above, this Court found that the case should be remanded for reexamination of Dr. Soliman's opinion. If on remand Dr. Soliman's view that Plaintiff cannot "interact with coworkers, supervisors and the general public [or] withstand the stress/pressures associated with an eight-hour workday, and day-to-day activities" receives great weight instead of some weight, this new conclusion would necessarily require the ALJ to reexamine the weight he assigned to the non-examining physicians' opinions. Accordingly, on remand, the ALJ should reconsider the weight he assigned to the non-examining physicians' opinions in conjunction with reanalyzing the weight of Dr. Soliman's opinion since one necessarily affects the other.

### 3. Conclusion.

The ALJ erred by failing to provide specific and legitimate reasons for discounting Dr. Soliman's examining opinion. Accordingly, even though there may be evidence in the record to support the non-examining physicians' findings, the Court cannot affirm the ALJ's decision to accord these opinions great weight until the issue of Dr. Soliman's opinion is resolved. The ALJ's decision was not supported by substantial evidence.

## C.   A Conflict Did Not Exist Between the Vocational Expert's Testimony and the Dictionary of Occupational Titles.

Plaintiff contends that the ALJ erred by failing to address a conflict between the vocational expert's ("VE") opinion and the Dictionary of Occupational Titles' ("DOT") definition for small products assembler I, because the DOT's definition requires work around moving and dangerous machinery while the VE asserted that Plaintiff's prior work did not include such an environment. Defendant contends that the ALJ properly found that Plaintiff could perform her past relevant work. The Court agrees with Defendant for the reasons set forth below.

1

2

### 1.     The ALJ Adequately Asked the VE to Affirm Consistencies Between Her Testimony and the DOT's Definition for Small Products Assembler I.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

To determine whether a claimant can complete past relevant work, an ALJ "may use the services of vocational experts or vocational specialists ["VS"], or other resources, such as the 'Dictionary of Occupational Titles' . . . ." 20 C.F.R. § 404.1560(b)(2). While courts have held that the DOT is the "'primary source of reliable job information' regarding jobs that exist in the national economy," the DOT is not a panacea for all disability determinations. *Zavalin v. Colvin*, 778 F.3d 842, 845-46 (9th Cir. 2015) (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990)). When a conflict arises between the DOT and a VE, "[n]either the DOT nor the [VE's] evidence automatically 'trumps.'" *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007) (quoting Social Security Ruling 00-4p, 2000 WL 1898704 at 2). Instead, "the ALJ must then determine whether the [VE's] explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the Dictionary of Occupational Titles." *Id.*; *see* Security Ruling 00-4p, 2000 WL 1898704 at 2 ("The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information."). Without an explanation from the ALJ addressing this conflict, courts cannot "determin[e] whether the ALJ's decision is supported by substantial evidence." *Zavalin*, 778 F.3d at 846. However, an ALJ needs to inquire only about an "obvious or apparent" conflict. *Lamear v. Berryhill*, 865 F.3d 1201, 1205 (9th Cir. 2017) (finding that it is not "likely and foreseeable that an office helper, mail clerk, or parking lot cashier with limitations on the ability to 'handle, finger and feel with the left hand' could perform these duties"); *see also Gutierrez v. Colvin*, 844 F.3d 804, 808 (9th Cir. 2016) (finding that it is unlikely and unforeseeable for a cashier to need to reach overhead).

26

27

28

Here, Plaintiff contends that the ALJ erred by failing to rectify a deviation between the VE's testimony and the DOT's definition for small products assembler I.[18] According to the DOT, this job requires "fasten[ing] parts together by hand or using handtools or portable powered tools" as well as "[l]oad[ing] and unload[ing] previously setup machines, such as arbor presses, drill presses, taps, spot-welding machines, riveting machines, milling machines, or broaches, to perform fastening, force fitting, or light metal-cutting operation on assembly line." Assembler, Small Products I, DICOT 706.684-022. During the VE's testimony, the ALJ posed a hypothetical, inquiring whether someone who "should avoid . . . moving and dangerous machinery" can complete such assembly work. (AR 68.) The VE opined that such a hypothetical claimant could work as an assembly line worker, a conclusion she affirmed after the ALJ further asked whether her opinion was "consistent in the DOT with respect to characteristics of occupations." (AR 69.) Accordingly, the ALJ adopted in the RFC that "claimant . . . should avoid . . . moving/dangerous machinery." (AR 40.)

Plaintiff contends that the machinery listed in the DOT's definition includes "moving and dangerous machinery," thus conflicting with the VE's testimony and the ALJ's RFC, while Defendant asserts this is not the case. The DOT's definition for small products assembler I itself states "Moving Mech. Parts: Not Present - Activity or condition

_____

[18] Plaintiff concedes in her motion to having worked as a small products assembler (Doc. No. 12 at 19-21), despite this job position not appearing on Plaintiff's self-reported work history reports (AR 289, 308). Rather, "small products assembler I" first enters the record when Plaintiff describes her work at "Bae Systems Tactical Vehicle Systems LP" at the hearing (AR 59-60). Plaintiff's official work reports did list this job position; however, these reports entered the record after Dr. Rudnick's and Dr. Payne-Gair's Disability Determination Explanations. (AR 261-62, 273.) Specifically, these determinations listed only phone receptionist, photo tech, live-in care giver, and CNS as Plaintiff's previous work experience (AR 82, 95, 109-10, 122-23) likely because Plaintiff listed only these jobs on a work history report she completed on June 1, 2015 (AR 308-313). For each of these listed jobs, but not small products assembler I, the non-examining physicians found that Plaintiff could not complete past work. (AR 110, 123.)

does not exist," suggesting that this job does not include work around moving parts. Assembler, Small Products I, DICOT 706.684-022. However, this does not preclude Plaintiff's entire contention because a machine can still be dangerous even without moving mechanical parts. *See Murphy v. Astrue*, No. CV 09-8640-JEM, 2011 U.S. Dist. LEXIS 3455, at *15 (C.D. Cal. Jan. 13, 2011).

Plaintiff also contends that while the DOT does not specify small products assembler I machinery as hazardous,[19] the Occupational Information Network [O*NET][20] does. Plaintiff cites to *Lee v. Barnhart*, which found that Social Security Regulations do not preclude using O*NET and that VEs can base their testimony on this source. 63 Fed. Appx. 291, 292-93 (9th Cir. 2003). However, while not only violating a Circuit Rule by citing to an unpublished opinion dated before 2007, USCS Ct. App. 9th Cir, Circuit R 36-3 ("Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit . . . ."), Plaintiff also ignores a 2010 review requested by the SSA that found use of "O*NET in its current form is not suitable for disability adjudication," Occupational Information Development Advisory Panel, *A Review of the National Academy of Sciences Report A Database for a Changing Economy: Review of the Occupational Information Network (O*NET)*, 1 (June 28, 2010); *see Rodriguez v. Astrue*,

---

[19] While often used interchangeably, courts have distinguished between "dangerous" and "hazardous" machinery. *See Malgra v. Astrue*, No. ED CV 11-0724-SP, 2012 U.S. Dist. LEXIS 17590, at *8 (C.D. Cal. Feb. 10, 2012) ("There is a significant distinction between 'dangerous' and 'hazardous.'") Namely, that which is hazardous is also likely dangerous, but a dangerous piece of machinery is not necessarily hazardous; therefore, the RFC limiting Plaintiff to avoid "dangerous" machinery would also likely exclude hazardous machinery.

[20] "The O*NET is a source of occupational information developed under the sponsorship of the United States Department of Labor/Employment and Training Administration, containing 'standardized and occupation-specific descriptors . . . covering the entire U.S. economy.'" *Jose Alfredo G. v. Saul*, No. 3:19-cv-00852-RBM, 2019 U.S. Dist. LEXIS 211076, at *9 n.5 (S.D. Cal. Dec. 5, 2019) (citing https://www.onetcenter.org/overview.html (last visited Nov. 27, 2019).

No. CV-10-0636-TUC-DTF, 2012 U.S. Dist. LEXIS 21024, at *8 n.3 (D. Ariz. Feb. 17, 2012).

Even if the Court agrees and exclusively relies on O*NET, Plaintiff does not even accurately detail this source. Plaintiff contends that under O*NET a small products assembler may face "exposure to hazardous equipment" pursuant to a frequency score of 70/100; however, this cited O*NET listing is not for small products assembler I only. Occupational Informational Network § 93956. Rather, it covers all "Assemblers and Fabricators - Except Machine, Electrical, Electronic, and Precision" with approximately 464 more specific DOT definitions, one of which is small products assembler I. *Id.* Accordingly, this source only suggests a possibility that small products assembler I requires interaction with dangerous machinery and is thus not probative here.

Turning to case law, courts are split on whether this job position requires interaction with dangerous machinery. Defendant cites to a series of "unlublished [*sic*]" opinions to specify the nonhazardous requirements of "the small parts assembler . . . job podityion [*sic*]." (Doc. No. 17 at 15.) In *Rehana*, the court held that at step five the plaintiff's specific job activities did not demand moving or dangerous machines for two main reasons: (1) there was "no indication that these small tools [in the DOT's definition] are hazardous [or] dangerous" and (2) an employee need not complete every duty enumerated in the DOT's definition. *Rehana v. Berryhill*, No. 2:16-cv-0006-EFB, 2017 U.S. Dist. LEXIS 47063, at *10-11 (E.D. Cal. Mar. 28, 2017); *see also Reyes v. Colvin*, No. CV 13-4850-MAN, 2015 U.S. Dist. LEXIS 7986, at *10 (C.D. Cal. Jan. 23, 2015) ("[A]lthough the job descriptions [provided at step five] state that the worker performs 'any combination' of the tasks listed in the DOT, they do not state that a worker is required to perform all of them or to use all of the equipment listed." (citation omitted)); *Ballesteros v. Astrue*, No. ED CV 10-301-PLA, 2011 U.S. Dist. LEXIS 24112, at *12 (C.D. Cal. Mar. 8, 2011) (finding that "the small products assembler occupation [proposed at step five] requires performance of 'any combination' of the enumerated duties, not all of which entail operation of motorized or dangerous equipment." (citation omitted)). In *Shannon*, the court also held that small

products assembler did not include exposure to dangerous or hazardous machinery because Social Security Ruling 96-9p's description of "hazards" do not match the DOT's assembler description. *Shannon v. Astrue*, No. EDCV 10-359 AGR, 2011 U.S. Dist. LEXIS 86078, at *7-8 (C.D. Cal. Aug. 4, 2011).

However, in *Jimenez* the court held that at step five the ALJ erred, finding that the tools described in the DOT definition for small products assembler I, as well as electronics worker, are inherently "dangerous machinery," without providing specific reasoning. *Jimenez v. Astrue*, No. EDCV 11-1670 JC, 2012 U.S. Dist. LEXIS 44082, at *11-13 (C.D. Cal. Mar. 29, 2012) Similarly in *Murphy*, the court held that at step five the Commissioner "did not meet his burden" by failing to clarify a conflict between the VE's assertion that plaintiff should not work around dangerous machinery and the DOT's definition for small products assembler II[21] that demanded such an environment. *Murphy v. Astrue*, No. CV 09-8640-JEM, 2011 U.S. Dist. LEXIS 3455, at *15 (C.D. Cal. Jan. 13, 2011). The court stated that "[t]he various machines specified in the DICOT job description may be hazardous in the absence of moving parts," without specifying what makes these tools hazardous. *Id.* at *16.

Here, the ALJ specifically asked the vocational expert whether her testimony conflicted with the DOT, inquiring whether it had "been consistent in the DOT with respect to characteristics of occupations." (AR 69.) This inquiry, however, did not specifically address the issue of moving or dangerous machinery. In light of the split in authority explained above, the Court cannot find that interacting with moving and dangerous machinery is an "obvious and apparent" duty of small products assembler I such that the

---

[21] In *Murphy*, the issue centered around the small products assembler II job position, not the small products assembler I job position at issue in the present case. However, both positions are light work and require the same set of tools called into question. *See* Assembler, Small Products I, DICOT 706.684-022; Assembler, Small Products II, DICOT 739.687-030.

ALJ should have sought further clarification from the VE.[22] The Court also notes that the instant case involves a step four decision, unlike each of the above cases that occurred at step five, the only step where the burden shifts to the ALJ to show that a claimant can indeed work. *See Valentine*, 574 F.3d at 689. Each of these factors sways the Court to agree with Defendant that the ALJ did not err in his interaction with the VE.

Lastly, Defendant contends that because Plaintiff "did not say she could no [*sic*] perform the job duites [*sic*] because she was required to work around hazardous machinery . . . she was not precluded from performing her past relevant work" because she could work the position as actually performed. (Doc. No. 17 at 16.) Defendant buttresses this argument by citing to *Philpott v. Colvin*, No. CV 14-06099-JEM, 2015 U.S. Dist. LEXIS 87418, at *18 (C.D. Cal. July 6, 2015). In *Philpott*, the court found that any error by the ALJ was harmless because "Plaintiff could perform the job as <u>actually</u> performed" on account that during the hearing "Plaintiff specifically stated she could work as a cook with occasional overhead reaching," the occupation and malady in question. *Id.* at *17-19 (emphasis in original).

Here, however, Plaintiff explicitly testified that she could *not* perform this job, stating to the ALJ at the hearing that, "with the assembly work, that's a lot of standing. Ain't no way I'd be able to do that." (AR 70.) Accordingly, *Philpott*'s logic does not apply. Nonetheless, while Plaintiff raised with the ALJ that there was "no way" she could complete small product assembler I work due to an inability to stand for long periods of time, Plaintiff did not press the VE about this restriction and only brought it up with the Court in her reply brief. Thus, the Court should not consider Plaintiff's second argument

---

[22] Moreover, *Rehana* and *Shannon* made connections between specific job duties of small products assembler I and Social Security Rulings for hazardous machinery. *Rehana*, 2017 U.S. Dist. LEXIS 47063, at *10-11; *Shannon*, 2011 U.S. Dist. LEXIS 86078, at *7-8. The courts in *Jimenez* and *Murphy* made no connection between the duties of small products assembler and the need to interact with moving and dangerous machinery. *Jimenez*, 2012 U.S. Dist. LEXIS 44082, at *11-13; *Murphy*, 2011 U.S. Dist. LEXIS 3455, at *16.

19-CV-604-JM(WVG)

that the ALJ erred by failing to rectify a discrepancy between the work's standing requirements and that asserted by the vocational expert. (Doc. No. 19 at 11); *see Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 843 n.6 (9th Cir. 2004) ("We decline to consider this argument because the appellee has not been given the opportunity to respond"); *United States v. Rearden*, 349 F.3d 608, 614 n.2 (9th Cir. 2003) ("We decline to consider Rearden's argument . . . because it is raised for the first time in reply."); *Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("We decline to consider new issues raised for the first time in a reply brief.")

### 2.   Conclusion.

Ultimately, the ALJ's RFC did not contradict the DOT's definition of small products assembler I because interacting with moving and dangerous machinery is not an obvious or apparent duty of this position.[23]  The ALJ did not err in failing to explore any conflict between the VE's testimony and the DOT's definition for small products assembler I.

## D.   The Medical Vocational Guidelines Do Not Direct a Finding of Disability.

Plaintiff contends that the ALJ erred in not finding her disabled because the Medical Vocational Guidelines ("the Grids") direct a finding of disability due to Plaintiff's age, education, work experience, and light RFC. Defendant contends that the ALJ properly did not apply these guidelines. The Court agrees with Defendant for the reasons set forth below.

### 1.   The Grids Do Not Direct a Finding of Disability Because the ALJ Never Reached Step Five and Because Plaintiff's RFC Includes   Multiple   Non-Exertional Impairments that Would Require Further Analysis.

The Grids apply at step five "and present, in table form, a short-hand method for determining the availability and numbers of suitable jobs for a claimant." *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006). By schematizing the claimant's residual

---

[23] If on remand Plaintiff's RFC changes, this issue may require reconsideration in light of any new RFC.

functional capacity, age, education, and previous work experience to direct a finding of either disabled or not disabled, the Grids provide a streamlined method for ALJs to make disability determinations. *Id.* at 1115; *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007). However, an ALJ can only apply the Grids in cases where they accurately describe the claimant's limitations and not in borderline cases or in cases where the guidelines plainly do not consider the claimant's limitations. *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985). While the Grids can apply in cases where the claimant has both exertional and non-exertional limitations, *Hoopai*, 499 F.3d at 1075, they are not appropriate to use without consultation from a VE when the non-exertional limitations do not result in the physical limitations that the Grids contemplate, *Barnes v. Berryhill*, 895 F.3d 702, 706 (9th Cir. 2018). If the claimant's non-exertional limitation is "significantly severe so as to significantly limit the range of work permitted by the claimant's exertional limitation," then the Grids are also inappropriate. *Hoopai*, 499 F.3d at 1076 (9th Cir. 2007) (quoting *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988) (quotations omitted) (finding that claimant's depression, while a non-exertional limitation, was not sufficiently severe enough to prohibit the ALJ's reliance on the Grids without a VE's assistance); *see also Tackett*, 180 F.3d at 1102 (finding that non-exertional limitations include "pain, postural limitations, or environmental limitations" as well as the need to change posture every half hour); *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 577 (9th Cir. 1988) (finding that non-exertional impairments include "poor vision or inability to tolerate dust or gases").

Here, Plaintiff contends that the Grids "direct a disability finding" pursuant to 20 C.F.R. Pt. 404, Subpt. P, App. 202.04 as of May 11, 2017, the date when Plaintiff turned 55 years old. (Doc. No. 12 at 21.) In pertinent part, this cited entry directs a finding of disability when the claimant has an RFC limited to light work, is at least 55 years of age, is a high school graduate, and has unskilled previous work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 202.04. While on May 11, 2017, the claimant was 55 years of age, was a high school graduate, had unskilled previous work experience, and had an RFC limiting

her to light work, Defendant correctly points out that Plaintiff "was found capacble [*sic*] of performing her past relevant work" at step four. (Doc. No. 17 at 16.) Thus, the ALJ never proceeded past step four to step five. Because the Grids only apply to a step five analysis, Plaintiff's argument is meritless.

Plaintiff further contends in her reply brief that the ALJ erroneously ruled on step four, meaning the claim should have proceeded to step five. (Doc. No. 19 at 12.) Plaintiff then briefly notes that "[a]t Step Five, the Medical Vocational Guidelines direct a finding of disability as noted in [Plaintiff's] motion for summary judgment." (*Id.*) The Grids, however, are not an infallible edict applied in every case. Even if the claim progresses to step five on remand, the ALJ cannot blindly apply the Grids to a claimant experiencing sufficiently severe non-exertional limitations. Plaintiff does not discuss the severity of these impairments, but her RFC does include non-exertional limitations, including "avoid[ing] concentrated exposure to fumes, odors, dusts, gases, unprotected heights and moving/dangerous machinery." (AR 40.) Furthermore, legal arguments in Plaintiff's SSA Memoranda and her motion for summary judgment rely heavily on her mental disorders, such as depression, bipolar disorder, anxiety, and PTSD. (AR 378-83, Doc. No. 12 at 13-23.) Due to these multiple non-exertional limitations present in this claim, the Grids would not automatically direct a finding of disability at a potential step five reevaluation without further analysis. Because the Court has remanded issues that could alter the Plaintiff's RFC, this claim could reach step five, where the Grids may be applied. That issue, however, is not currently before the Court.

### 2.    Conclusion.

The ALJ did not err by failing to apply the Medical Vocational Guidelines. The Grids only apply to step five analyses, but the ALJ never made it past step four. Even if the ALJ should have proceeded to step five, the Grids do not unequivocally apply in every case, especially where non-exertional limitations are present. However, if on remand Plaintiff's RFC changes, this issue may require reconsideration in light of a new RFC that could bring the analysis to step five.

**E.     The ALJ's Errors Were Not Harmless.**

Having found that the ALJ erred, the Court must consider whether the ALJ's errors were harmless. Error is harmless "where the mistake was nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion," *Stout v. Comm'r*, 454 F.3d 1050, 1055 (9th Cir. 2006), or where it is "clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008); *see Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2007); *see also Batson v. Comm'r*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding an error harmless where it did not negate the validity of the ALJ's ultimate conclusion). Moreover, "a reviewing court cannot consider [an] error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Stout*, 454 F.3d at 1055-56.

Here, Defendant contends that the ALJ did not err; however, if the Court holds that the ALJ did err, Defendant contends in the alternative that "the case should be remanded for the ALJ to evaluate the entire record and address these issues." (Doc. No. 17 at 18.) The Court agrees that remand for further proceedings is appropriate. The ALJ found that Plaintiff did not meet or equal a Listing 1.02 impairment after failing to analyze the entire record and support his conclusion with substantial evidence. The ALJ also accorded only "some weight" to Dr. Soliman's opinion without providing specific and legitimate reasons for this discount. Should the Commissioner find that Plaintiff does meet Listing 1.02 criteria, Plaintiff must receive benefits. Should the Commissioner alter the RFC after further analyzing Plaintiff's Listing 1.02 criteria or treating Dr. Soliman's opinion with greater weight, a finding of disability may be appropriate.

If on remand the Commissioner concludes that Plaintiff cannot perform her past relevant work, he may nonetheless deny Plaintiff benefits if at step five he finds that she can perform other work available in significant numbers in the national economy. 20 C.F.R. § 404.1520(g). Because the ALJ found that Plaintiff could perform her past relevant work

1
2
at step four, he correctly did not make a step five finding. As a result, remand would be
appropriate to allow the Commissioner to consider step five, if necessary.

3
4
In sum, based on the combined factors above, the Court does not conclude that the
ALJ's errors were harmless.

5
**F.    Remand for Further Proceedings.**

6
7
8
9
10
11
12
13
14
15
16
Plaintiff contends that "this Court can make a finding of disability without a
remand," however, in lieu of reversal, Plaintiff contends in the alternative that the Court
"remand back to the administration for further proceedings." (Doc. No. 19 at 13.) A remand
for further proceedings is unnecessary if the record is fully developed and clearly shows
that the ALJ would be required to award benefits. *Holohan v. Massanari*, 246 F.3d 1195,
1210 (9th Cir. 2001). The decision whether to remand for further proceedings turns upon
the likely utility of such proceedings. *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir.
2000). Under the law of this Circuit, the Court must "direct the award of benefits in cases
where no useful purpose would be served by further administrative proceedings, or where
the record has been thoroughly developed." *Varney v. Sec'y of HHS*, 859 F.2d 1396, 1399
(9th Cir. 1988) (citations omitted).

17
18
19
20
For the Listing 1.02 criteria, the ALJ failed to analyze the entire record and support
his conclusion with substantial evidence. Accordingly, there would be a useful purpose in
further administrative proceedings where the ALJ does analyze the entire record in order
to properly determine whether Plaintiff meets these criteria.[24] As to the ALJ's error of

22
23
24
25
26
27
28
[24] Because remanding the case would serve a useful purpose, Plaintiff's request for the
Court to apply the "credit as true" rule is necessarily invalid. (Doc. No. 22-23.) Under this
standard the Court may reverse for an award of benefits if: "(1) the record has been fully
developed and further administrative proceedings would serve no useful purpose; (2) the
ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether
claimant testimony or medical opinion; and (3) if the improperly discredited evidence were
credited as true, the ALJ would be required to find the claimant disabled on remand."
*Garrison*, 759 F.3d at 1020. While Defendant questions this doctrine's validity (Doc. No.
17 at 17-18), that it requires "no useful purpose" for further administrative proceedings
sinks any potential applicability in the case at bar.

19-CV-604-JM(WVG)

failing to provide specific and legitimate reasons for according Dr. Soliman's opinion "some weight," even if the ALJ fully credits this opinion, changes Plaintiff's RFC, and finds her incapable of performing past relevant work at step four, the ALJ could still deny benefits at step five. As a result, the Court cannot conclude that remand for further proceedings would serve no useful purpose.

**G.     Disposition of Defendant's Summary Judgment Motion.**

Based on the foregoing recommendations that Plaintiff's MSJ be GRANTED-IN-PART and DENIED-IN-PART and this matter be remanded for further proceedings, this Court necessarily recommends that Defendant's Cross-MSJ be GRANTED-IN-PART and DENIED-IN-PART.

## V.     CONCLUSION

This Court RECOMMENDS that Plaintiff's MSJ be GRANTED-IN-PART and DENIED-IN-PART, that Defendant's Cross-MSJ be GRANTED-IN-PART and DENIED-IN-PART, and that the matter be REMANDED for further proceedings.

This Report and Recommendation is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b).

IT IS ORDERED that **no later than August 14, 2020**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

IT IS FURTHER ORDERED that any reply to the objections shall be filed with the Court and served on all parties **no later than August 25, 2020**. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: July 28, 2020

_____
Hon. William V. Gallo
United States Magistrate Judge